No. 33,701

Eva Gardner, *Appellant*, v. The Ark Warehouse Company et al.,
*Appellees.*

(80 P. 2d 1066)

Opinion filed
July 9, 1938.

*E. T. Bloomer*, of Winfield, *W. L. Cunningham, D. Arthur Walker* and *Wm. E. Cunningham*, all of Arkansas City, for the appellant.

*J. A. McDermott, Chandler F. Jarvis* and *J. M. McDermott*, all of Winfield, for the appellees.

The opinion of the court was delivered by

Dawson, C. J.: This is an appeal from a judgment affirming an award which denied compensation for the death of Lindle Lavere Gardner, an employee of the Ark Warehouse Company.

The basis of the compensation commissioner's award, as well as of the district court's judgment, was that the evidence was insufficient to prove that Gardner had sustained any accident or injury in the service of his employer which resulted in his death.

Disagreeing with the compensation commissioner and with the trial court, the record is brought here on appeal; and this court is asked to read it in the expectation that we will take a different view of its significance and remand the cause with instructions which might lead to a different result. And so we have assiduously read the abstract and counter abstract. For present purposes the pertinent facts may be summarized thus:

The Ark Warehouse Company is a licensed carrier engaged in the transportation of goods by trucks from Arkansas City and Winfield to Independence and intermediate points. Gardner was one of its truck drivers.

On February 7, 1933, the weather was very cold and there was considerable snow in southern Kansas. In the middle of that afternoon, Gardner's truck skidded into a roadside ditch near Elk City.

Gardner shoveled the snow from about the truck in an effort to get it back on the road. That effort was unsuccessful, but in the course of it Gardner froze his ears, fingers, cheeks, and also his feet to some extent. About 6 o'clock that evening the truck was gotten back on the highway, and Gardner spent the night at a hotel in Elk City. Next morning he drove the truck home to Arkansas City.

After the incident just stated, Gardner continued his accustomed work of driving his truck back and forth on his regular route every day until February 13, except one intervening Sunday. His working hours were long, varying from 11 hours to 15⅔ hours per day. He was on duty 93⅔ hours during the last week of his life, which averaged 13 hours and 23 minutes per day.

On February 13, en route from Independence to Arkansas City, near Grenola, some 10 miles west of Moline, about 3:30 p. m., the axle of Gardner's truck broke. It was another cold day—about 15 or 18 degrees above zero. Gardner had a passenger with him that day, one Charles S. Gleason. The two men worked for some time in an effort to put the truck to rights, but had to give it up and wait for help. In his efforts about the truck Gardner again froze his fingers. He was obliged to stay with the truck all the long cold afternoon to protect its contents. The cab was not heated nor well enclosed, so the two men went inside that part of the truck called the van. There they piled the goods so as to leave a narrow space in the middle for themselves. The truck was equipped with kerosene flares, and they lighted them to create some heat and shut the door to keep out the cold.

While waiting for help to fix his truck on the highway that afternoon Gardner told Gleason of his hard life and long hours, of his hard luck in skidding into the ditch the week before, and said that the breakdown of his truck that day would prevent him getting the $5 bonus which his employer offered to drivers who had no mishaps on their routes during some specified period of time.

The kerosene flares consumed so much oxygen inside the van that Gardner became drowsy and may have fallen asleep for a time. Gleason occasionally opened the van door slightly for a breath of fresh air. Both men were covered with smudge from the flares when at length a mechanic came and repaired the truck. Gardner appeared to be dull and spiritless, but took his place at the wheel and drove the truck home to Arkansas City, some 50 or 60 miles, arriving there at 10:30 p. m. the same evening.

That night Gardner slept in a bunkhouse at the warehouse premises. Next forenoon he helped load and unload trucks for his employer until about 11 o'clock in the forenoon. Shortly thereafter he committed suicide by shooting himself. Before doing so he wrote a farewell note to his wife. The note was not offered in evidence, but counsel agreed that its contents read thus:

"'I don't want the blame to go to anyone, and I am the one that has made a mess of my life and I have to go sometime, so why not now? I am sorry I couldn't find the writing paper for my last letter. People will think I am crazy, but I believe I am sane as much as ever.' It is also stipulated that the letter contained instructions as to what clothes the deceased wished to be buried in, and what songs were to be sung at the funeral. 'I want the same songs that were sung at mother's funeral.' And that the letter also contained a request that no one cry at the funeral and finished the sentence 'but that would be impossible,' and that the letter also contained the following language: 'Well, I am tired, so will go to sleep and also to the unknown. Love to all.'"

Evidence was also offered in behalf of claimant that the fumes of the kerosene flares would tend to make a person dull and despondent. Hypothetical questions were formulated which summarized the evidence favorable to her and propounded to medical experts seeking to elicit their opinion that Gardner's hard work and long hours, the mishaps to his truck on February 7 and February 13, the repeated freezing of his fingers, cheeks, ears and feet, and his subjection to cold and exposure, the loss of his hoped-for bonus of $5, and his apparent stupefaction from inhaling the fumes of the kerosene flares on the afternoon of February 13, caused him to commit suicide between 11 o'clock a. m. and 12 o'clock noon on the following day—thus constituting such an industrial accident as the workmen's compensation act was designed to cover. The examiner for the compensation commission held the view that such hypothetical questions were not competent, but permitted them to be answered for the sake of the record.

From the judgment of the trial court which affirmed and sustained the findings of the compensation commissioner, the claimant assigns various errors. But first we must remind counsel of the very limited scope of appellate review conferred by statute on this court. We have jurisdiction of questions of law only. (G. S. 1935, 44-556.) Whether the evidence adduced would support the plaintiff's claim, if given the most generous credence, is not for this court to decide. The only concern about the evidence in a compensation case with which this court has to do is whether the evidence was legally suffi-

cient, if the fact-finding functionaries gave it full credence, to support a finding that the workman suffered an accident and injury in the course of his employment and as a consequence of that employment. Such a question is one of law, and it is the only one pertaining to the evidence which this court is authorized to review. There are numerous instances in our reports where this court has been constrained to hold that such question required a negative answer. Nowhere in our reports, however, will a case be found where we have substituted our judgment for that of the compensation commissioner and the trial court where they have held the evidence insufficient to support an award to the workman or his dependents under the terms of the act.

Within these narrow limits of appellate review which the legislature has prescribed, we will notice appellant's contentions as they appear in her brief. It is first argued that Gardner did suffer a personal injury by accident arising out of and in the course of his employment. We think it doubtful if the evidence to that effect, given its largest credence, would have been legally sufficient to support such a finding of fact if the trial court had so held. Its finding to the contrary is unassailable on appeal. Counsel for claimant cite respectable authorities which hold that suicide which results from a deranged mind brought about by carbon monoxide poisoning, such as the kerosene flares might cause, constitutes an accident within the terms of the compensation act. We see no reason to question that proposition. The point fails here because the functionaries authorized to find the facts were not convinced by the evidence, the circumstances and the presumption against suicide, that Gardner's death was traceable to an industrial accident for which his employer should pay.

Touching the testimony which the examiner held incompetent, it all went into the record nevertheless, not only the answers to the hypothetical question, but also the testimony of witnesses touching Gardner's appearance and actions after the mishaps to his truck on February 7 and February 13; and certainly we could not say as a matter of law that the trial court was bound to give that testimony unreserved credence, and to deduce therefrom the ultimate fact that Gardner's suicide was the result of an industrial accident within the meaning of the statute.

In conclusion we wish to commend the unusual care and thoroughness with which counsel for claimant have presented the theory on which her claim for compensation is predicated. We are compelled to hold, however, that no error is made to appear in the judgment of the trial court. That judgment is therefore affirmed.