No. 62,448

A. B. HUDSON and FAIRWAY OIL, INC., *Appellants/Cross-appellees,* v. THE CITY OF SHAWNEE, KANSAS, A municipal corporation, *Appellee/Cross-appellant.*

(790 P.2d 933)

Opinion on rehearing filed April 13, 1990, modifying opinion filed July 14, 1989

*Michael A. Preston,* of McDonald, Preston & Louk, Chartered, of Overland Park, was on the briefs for appellants/cross-appellees.

*Marvin E. Rainey,* of Marvin E. Rainey & Associates, of Overland Park, was on the brief for appellee/cross-appellant.

The opinion of the court was delivered by

HERD, J.: This is a condemnation case. A.B. Hudson and Fairway Oil, Inc., (landowners) appeal an award for the taking of permanent and temporary easements. The City of Shawnee (City) cross-appeals the trial court's pretrial ruling that the City acquired the right to deny access to the property during the entire two-year term of the temporary easement. This case again comes before us on a petition for rehearing. Landowners, in well-written briefs, seek modification of our recent decision *Hudson v. City of Shawnee,* 245 Kan. 221, 777 P.2d 800 (1989). The two grounds sought for the modification of our original opinion are issues urged originally. However, these issues were presented eloquently enough in the motion for rehearing to persuade this court to give them further consideration. The issues to be reconsidered are the uncompensated closing of the east entrance of the landowners' property on 75th Street under the police power during the pendency of the condemnation action, and the division of the I-35 highway improvement project and the 75th Street widening project into two projects, making the effect of the I-35 construction on traffic flow admissible evidence in the 75th Street case. This opinion repeats our original opinion with modifications on the issues reheard. The judgment of the district court is again affirmed.

The landowners own property in Shawnee, Kansas, upon which they operate a service station. The property is in the southwest quadrant of the intersection of 75th and Switzer Streets. Originally there were two driveways to 75th Street from the north of the station and one driveway to the east onto Switzer.

The City filed a petition in eminent domain to acquire a five-foot-wide permanent easement along 75th to widen the street from a two-lane to a four-lane street. The City also requested a temporary construction easement ten feet wide along 75th and thirty feet wide along Switzer. The temporary easement encompassed the three driveways to the station.

The City's construction project was planned to occur at the same time as the Kansas Department of Transportation's project to widen 75th Street at the I-35 interchange and reconstruct the interchange so it would go over I-35 rather than under it. Both projects were designed to improve traffic flow; the City project was necessary to eliminate a bottleneck which would otherwise exist after the completion of the state project.

The construction plans with the condemnation petition revealed the City intended to permanently close the east 75th Street driveway to the station. The landowners therefore moved for a pretrial finding on whether the permanent closing of the east 75th Street driveway could be considered in arriving at the compensation award.

At the evidentiary hearing on the matter, evidence was presented that 75th Street could not be suitably widened without closing the east 75th Street driveway. The entrance had been unsafe to begin with because it was only 10 feet from the intersection. Cars using the driveway to go east on 75th join the traffic at the intersection and may not be able to align themselves properly and see the traffic signals. Cars traveling west on 75th Street and attempting to turn into the driveway block the intersection while waiting for eastbound traffic to clear. After construction, the driveway would be more dangerous because of increased traffic and because sidewalks to be constructed across 75th Street west of Switzer would cross into the driveway. Although there had been no plans to close the driveway for safety reasons before plans for construction began, it was decided in the final planning stages of construction it was necessary to close the east driveway for safety reasons. The evidence showed the remaining two driveways provided adequate ingress and egress to the station for traffic from any direction.

The trial court ruled evidence of damages as a result of closure inadmissible. It found the permanent closing of the east driveway on 75th Street to be a proper exercise of the police power which did not substantially interfere with access.

In response to a motion in limine by the City to determine the rights the City acquired by its petition for a temporary easement, the court ruled the City acquired the right to close all driveways to the station for two years. The court denied a later

motion in limine by the landowners to prohibit testimony concerning the construction of an overpass at 75th Street and I-35, the closure of 75th Street at that intersection, and its effect in reducing traffic to the landowners' property. The City thus introduced at trial newspaper articles to demonstrate public knowledge on the date of taking of the proposed construction work on 75th and I-35. The City's real estate expert estimated public knowledge would cause 75% of the normal 75th Street traffic to divert elsewhere. He thus concluded damages due to the temporary easement should be reduced by 75%.

Evidence of damages ranged from $18,000 to $58,240. The experts testified the damages to be totally or primarily due to the two-year temporary easement. They based their damages for the temporary easement on the fact that the driveways to the property could be blocked for two years from the filing of the appraisers' report. The permanent easement was not considered to cause significant damage to the property in its use as a service station. The jury found total damages to be $27,500.

The landowners appeal after the denial of their motion for a new trial. The City cross-appeals.

Since this issue overlaps into all others, let us first consider the City's cross-appeal. The issue is whether the trial court erred in ruling as a matter of law that the City by its petition acquired the right to deny all access to and from the landowners' property for two years under the temporary construction easement.

The City's petition defined the taking as follows:

"a temporary easement for the purpose of surveying, excavating, filling, grading *and all other purposes incidental* to the construction of a street or sidewalk on the permanent right of way adjacent thereto substantially as shown on the 'Plans for Street Improvement, 75th Street, City of Shawnee, Kansas', . . . filed with the City Clerk of the City of Shawnee. All areas disturbed are to be restored by replacement of sod or pavement to a condition as good as or better than before. No trees or improvements are to be damaged or removed excepting those indicated on the plans aforedescribed. No part of any building or structure, including any eaves, awnings or other overhanging attachment, either within or partly within said temporary easement, shall be damaged or removed unless indicated on the plans aforedescribed. Said temporary easement shall expire two (2) years from the date of the filing of the Appraisers' Report herein or ninety (90) days after completion and acceptance of the project by the City, whichever occurs first. The owners, tenants, lienholders and easement holders, their

heirs and assigns, may cultivate and fully use and enjoy the land within the construction easement, *provided such use shall not interfere with the construction of the street."* (Emphasis supplied.)

The petition gives the City the right to use the temporary easement for two years from the filing of the appraisers' report. The alternate termination date is dependent upon a subjective decision by the City and thus provides no termination at all. The appraisers' report adopted this definition of the temporary easement.

The property rights taken by the condemnor are to be determined by the language in the petition for eminent domain and the report of the appraisers. *Sutton v. Frazier,* 183 Kan. 33, 325 P.2d 338 (1958). The legal requirements for the content of the petition are simple, as provided by K.S.A. 26-502:

"A petition shall include allegations of (1) the authority for and the purpose of the taking; (2) a description of each lot, parcel or tract of land and the nature of the interest to be taken; (3) insofar as their interests are to be taken (a) the name of any owner and all lienholders of record, and (b) the name of any party in possession. Such petition shall be verified by affidavit. Upon the filing of such petition the court by order shall fix the time when the same will be taken up. No defect in form which does not impair substantial rights of the parties shall invalidate any proceeding."

In determining damages for the taking of the interest in property, consideration is to be given to the fifteen factors listed in K.S.A. 26-513, including access.

As noted earlier, the temporary easement encompassed all three driveways to the property. The trial court held the language of the petition gave the City the right to deny all access to the property for the entire two-year term of the easement. It thus held the landowners were entitled to compensation based on this right. The City argues compensation should be less because at least one driveway to the station remained open during the entire term of the easement.

The law is clear that landowners are entitled to full compensation for the actual rights acquired by the condemnor, not the rights actually used. *Hoy v. Kansas Turnpike Authority,* 184 Kan. 70, 334 P.2d 315 (1959); *Barcus v. City of Kansas City,* 8 Kan. App. 2d 506, 661 P.2d 806 (1983). It is also clear that a property owner's right to access to and from his property, and to have

that access available to his customers, may not be taken from him in condemnation proceedings without the payment of just compensation. *Riddle v. State Highway Commission,* 184 Kan. 603, 610, 339 P.2d 301 (1959).

The City argues it did not acquire the right to block off all access to the property because the petition did not specifically claim such a right. The condemnor bears the burden of drafting its petition for condemnation to make clear that a landowner retains access where an easement covers driveways. In *Roberts v. Upper Verdigris Watershed,* 193 Kan. 151, 158-59, 392 P.2d 914 (1964), we held the trial court erred in allowing evidence that the condemnor's intended use was less than the fullest use permitted under the language of the easement. The condemnor argued payment for complete use of the easement would be impracticable since the easement would in reality be used infrequently. We rejected the argument, stating, "The suggestion has no merit. If the condemner desires only an infrequent limited use of the easement condemned it need only make certain that the limited use is properly stated in the petition." A Rhode Island case is directly on point. In *Kentucky Fried Chicken of Warren v. Flanders,* 461 A.2d 927 (R.I. 1983), the Supreme Court of Rhode Island upheld the trial court's decision that the landowner be compensated for full deprivation of access for the two years of a temporary easement covering the driveways. The Supreme Court stated:

"An examination of the language of the condemnation documents discloses no written assurance on the part of the state that access to the owner *would* be provided during the two-year period. . . . [I]t is not what the condemning authority may subjectively intend to do but what such authority has seized within the four corners of the documents of condemnation which controls the measure of damages of the time of the taking." (Emphasis supplied.)

The City nevertheless argues it could not take complete access without *specifically* claiming this right because property located adjacent to an existing street has a *common-law right* of access to that thoroughfare. *Riddle,* 184 Kan. at 610. The City cites *Sutton v. Frazier,* 183 Kan. 33, in support. In *Sutton,* the issue was whether property initially condemned for a sewage disposal plant also conveyed mineral rights to the condemnor. We held

the statutory authority for the condemnor contemplated only the acquisition of an easement for a sewage plant, rather than acquisition of fee simple title, and held the public use of a sewage plant does not include mineral rights. The landowner retains the right to use condemned property for any purpose not inconsistent with the public right. *Kansas Gas & Electric Co. v. Winn,* 227 Kan. 101, 605 P.2d 125 (1980); *Harvey v. Railroad Co.,* 111 Kan. 371, 372, 207 Pac. 761 (1922). While the acquisition of oil and gas would not normally be consistent with the construction of a sewage plant, the right to impair access to property during construction of an adjacent street is highly consistent. The petition stated the easement was for "surveying, excavating, filling, grading and *all other purposes incidental to the construction* of a street or sidewalk on the permanent right of way adjacent thereto." (Emphasis supplied.) *Sutton* does not stand for the proposition that every common-law right of property owners must be specifically listed in a condemnation petition in order to be taken.

The City also argues its right to block the driveways was restricted by the construction plans, which were incorporated into the petition for eminent domain. The plans showed the driveways were to be resurfaced and graded—the City argues no reasonable person would expect this to take two years. However, the plans do not limit the City's right to block access to the period of time necessary to resurface and grade. The City had the right to block the driveways "for the purpose of surveying, excavating, filling, grading and all other purposes incidental to construction of a street or sidewalk." Such a broad taking certainly could encompass closing all driveways to facilitate the construction if the condemnor so desired.

We hold the district court's ruling on the cross-appeal was correct and it is affirmed.

Let us now turn to the issues raised on appeal by the landowners. The first issue is one of those reheard and presents the question of whether a condemnor may restrict access under the exercise of the police power without compensating the property owner where the issue of public safety was not raised until after an eminent domain proceeding was in progress. We modify our opinion as follows: While this issue is sometimes treated differently in other jurisdictions, we have followed 2A Nichols on

Eminent Domain § 6.37[4] (3d ed. rev. 1987), which states: "Concurrent with a compensable taking in a condemnation proceeding, the State may validly exercise the police power for traffic control and public safety, for which there can be no compensation, even if it affects the method of ingress and egress."

Initially we must recognize that a regulation under the police power is not a taking. A reasonable regulation imposed to protect the public is not a "taking in the constitutional sense because the public use is paramount and public safety is the desideratium." *Ray v. State Highway Commission*, 196 Kan. 13, 23, 410 P.2d 278, *cert. denied* 385 U.S. 820 (1966). See *Mugler v. Kansas*, 123 U.S. 623, 31 L. Ed. 205, 8 S. Ct. 273 (1887). Police power is an inherent power of the sovereign and is essential to protect members of the community from injury. It rests upon the fundamental principle that all property is owned subject to the limitation that its use may be regulated for the safety, health, morals, and general welfare of the community in which it is located. *Ray v. State Highway Commission*, 196 Kan. at 22-23. See *Panhandle Co. v. Highway Commission*, 294 U.S. 613, 622, 79 L. Ed. 1090, 55 S. Ct. 563 (1935).

The question of whether the regulation of access to Hudson's property was a compensable taking is a question of law. The closing of all access to property is an unreasonable regulation. The trial court ruled that under the facts of this case the regulation under the police power was reasonable and therefore not compensable. We agree.

The question then remaining is whether the failure on the part of the City to raise the issue of a noncompensable regulation under the police power until the eminent domain proceeding was in progress affects the City's police power regulation. We hold it does not. So long as the police power regulation is reasonable it may be administratively asserted at any time by the City, and the timing of its assertion does not affect the substantive issue. The landowners have the right to challenge the reasonableness thereof in an implied contract action against the City. However, where a condemnation action is pending involving the property, a part of which is the subject of police power regulation, the unreasonableness of the police power regulation may be tried in the condemnation action. The burden of proof is upon the one

asserting unreasonableness. If it is determined that the regulation is unreasonable, it then becomes a taking and is compensable. Under the facts of this case, where landowners have two remaining entrances, one on 75th Street and one on Switzer, we hold the closing of the east entrance on 75th Street is a reasonable exercise of the City's police power for the safety of the public for which landowners are not entitled to compensation.

The next issue is whether the trial court erred in refusing to strike the testimony of the City's design engineer, James Scherzberg, when the City's attorney stated on cross-examination that the engineer was not the City's agent. The landowners argue this qualified as an admission the engineer could not testify as to the City's reasoning for closing the driveway. They argue his testimony on the safety of the entrance was thus speculative and should have been stricken under *In re Central Kansas Electric Coop., Inc.*, 224 Kan. 308, 582 P.2d 228 (1978). *In re Central* involved testimony from a mechanical engineer that the electrical field beneath transmission lines might endanger the health of pigs. We held the opinion should have been stricken as speculative because the engineer had no experience concerning the effects of electrical fields on animals. His opinion instead was based on studies which were, at best, inconclusive on the question. In the instant case, Scherzberg was retained by the City to design the construction project. He participated in the decision to close the driveway. He therefore had direct knowledge of why the City closed the entrance. His testimony was not based on conjecture and was correctly admitted. This issue is without merit.

The next issue is whether the trial court erred in not striking as speculative the testimony of the traffic engineer. The landowners argue the engineer's testimony is speculative under *In re Central* because he testified he did not know why the City closed the driveway and because there was no evidence the City relied on his opinion in closing the driveway. The testimony was not sought on the question of why the City closed the entrance, however, but on whether the driveway was safe prior to construction and whether convenient access to the property remained after construction. Since we find the issue of safety relevant, the engineer's testimony was admissible on that point. The question

of whether convenient access remains is always relevant in a condemnation proceeding.

The landowners cite *Staudinger v. Sooner Pipe & Supply Corporation,* 208 Kan. 100, 490 P.2d 619 (1971), in support of their further contention there was insufficient foundation, without physical examination of the property, for the traffic engineer's opinion on safety and access. In *Staudinger,* we held a surgeon could not answer an abstract question concerning the effects of alcohol without the foundation of the facts in the case. We noted the facts could have been, but were not, placed in evidence. We held an expert witness must base his opinions on facts within his personal knowledge or observation, *or* made known to him at the hearing. *Staudinger,* 208 Kan. at 104. In the instant case, the engineer's opinion was based upon his examination of the engineering plans for the construction project. The plans were properly in evidence and clearly depicted the significant features of the property before and after construction. There is no evidence the trial court abused its discretion in allowing the witness' testimony.

The next issue is whether the trial court erred in allowing into evidence excerpts and standards from books relied upon by street design engineers showing minimal distances which should be allowed between entrances and intersections. The landowners also argue the trial court erred in receiving evidence that 75th Street had been declared a controlled access facility ten years earlier. The landowners argue these documents were irrelevant as there was no evidence the information they contained was relied upon by the City in its decision to close the entrance. We find this evidence relevant and properly admitted to show justification for use of the City's police power.

The landowners also object to the introduction of documentary evidence of projections of traffic furnished to the design engineer by the Kansas Department of Transportation in reply to a request by the engineer's firm. The trial court overruled the landowners' objections of hearsay and lack of foundation, citing the business records exception contained in K.S.A. 1988 Supp. 60-460(m). The landowners argue the documents were inadmissible pursuant to *State v. Guhl,* 3 Kan. App. 2d 59, 588 P.2d 957, *rev. denied* 225 Kan. 846 (1979). However, in *State v. Cremer,* 234 Kan. 594, 676 P.2d 59 (1984), we held the Court of Appeals erred in

relying on *Guhl* to hold that bank statements made in the regular course of business could not be admitted because no representative of the bank testified as to their preparation. We held the policy of K.S.A. 1988 Supp. 60-460(m) is to rely on the sound discretion of the trial court to determine whether the evidence is trustworthy. We find no abuse of discretion here.

Next, let us consider the other issue reheard, whether the trial court erred in allowing evidence concerning the effect of construction work on 75th Street and I-35 on the value of the landowners' property. Newspaper articles were admitted to demonstrate public knowledge of the closure of 75th Street at I-35. The City's real estate expert estimated public knowledge would result in a 75% reduction in traffic by the landowners' property, and thus discounted the landowners' damages due to the City's condemnation by 75%. We modify our original opinion on this issue in only two small particulars.

The general rule is that *enhancement* or depressing of value due to anticipated improvements by the project for which condemnation is sought is excluded in determining fair market value. 4 Nichols on Eminent Domain § 12.3151 (3d ed. rev. 1985). The City argues the general rule does not apply in the instant case because the effect on market value is caused by a separate construction project. A loss in value caused by an *unrelated* project may be considered in determining fair market value. 4 Nichols on Eminent Domain § 12.3151[3] at 12-470. The party asserting that two or more projects should be considered as one for valuation purposes has the burden of proving the projects are related. See *United States ex rel. T. V. A. v. 137 Acres of Land, Etc.*, 406 F.2d 1283, 1287 (6th Cir. 1969); *State v. Alaska Continental Development Corp.*, 630 P.2d 977, 984 (Alaska 1980).

The landowners argue the state project should not be considered a separate project from the City's because the City's project was clearly designed in conjunction with the construction on 75th and I-35. Both projects were approved and developed at the same time, designed within the same time frame, and constructed concurrently. Both were intended to improve traffic along 75th Street. The widening of 75th near the landowners' property was deemed necessary as a *result* of the state's construction at 75th and I-35, so that the increased traffic would not bottleneck.

However, the City's design engineer testified the projects were separate, not dependent on each other, and capable of being separately constructed. The Kansas Department of Transportation was in charge of the 75th and I-35 project and received federal funding from the Interstate Highway Improvement Project. It had a separate project identity and is located in a different city, Merriam. Johnson County and the City of Shawnee were in charge of the project to widen 75th Street adjacent to the landowners' property and received federal funding from a different program. The interchange project was not contingent upon the widening of 75th near the landowners' property, and the design engineer testified it would have been "desirable" to widen 75th at that point regardless of the interchange project. In the absence of evidence of bad faith or collusion, we hold the two projects were separate and that evidence of reduced traffic as the result of the I-35 construction is admissible to prove reduced damages to the landowners in the widening of 75th Street.

This brings us to the landowners' argument that the newspaper articles should not have been admitted because they were hearsay. We hold the argument is without merit. The articles were not introduced to show the truth of the matter asserted in the articles—that construction would take place—but to show that the public would reroute their driving. Newspaper articles are generally admissible to show public knowledge. *Hotel Riviera, Inc. v. Short,* 80 Nev. 505, 396 P.2d 855 (1964); Annot., 20 A.L.R.3d 648. The landowners' further objection that no foundation was provided that public knowledge of construction at 75th and I-35 would lessen traffic and, thus, their damages, is also without merit. An expert witness is allowed to present his opinion that knowledge in the market place will have an impact on market value without other evidence of such impact. "[O]nce a witness has qualified as an expert, a court cannot regulate the factors he uses or the mental process by which he arrives at his conclusion. These matters can only be challenged by cross-examination testing the witness' credibility." *City of Bonner Springs v. Coleman,* 206 Kan. 689, 695, 481 P.2d 950 (1971). See *Willsey v. Kansas City Power & Light Co.,* 6 Kan. App. 2d 599, 602-03, 631 P.2d 268, *rev. denied* 230 Kan. 819 (1981).

The landowners next object that the real estate expert's figure of 75% traffic diversion, with a resulting 75% reduction in damages during construction, has "no foundation in fact or theory." The trial court held, in overruling the landowners' objection, that: "[F]rankly, the percentages that Mr. Fern used seemed to be no more speculative than some of the other numbers that the experts used for various types of things, and I just think it goes to the weight, not the admissibility." Fern qualified as an expert, giving him authority to testify as to his opinion. He exercised that authority after qualifying. We find no abuse of discretion in admitting his testimony.

Let us now turn to whether the trial court erred in permitting the real estate expert to use a comparable sale concluded six years before the date of taking in determining the value of the landowners' property. The expert used four comparable sales in arriving at his opinion of value. Two sales occurred on 75th Street a few blocks away from the landowners' property, on dates close to the time of taking. One property sold for $7.05 a square foot and the other $6.90 a square foot. Another property was off 75th Street, and therefore its price had to be adjusted upwards. The landowners objected to the expert's use of a sale of property along 75th Street that occurred six years earlier, at a price of $4.48 a square foot. The trial court overruled the objection, holding the remoteness of the fourth sale went to weight and credibility rather than admissibility. Whether a prior sale is too remote to be received in evidence is a question to be left to the discretion of the trial court. *Willsey,* 6 Kan. App. 2d at 615. Fern finally determined the landowners' property to be worth $7.25 a square foot, as discussed earlier. There is no evidence the trial court abused its discretion. See *Lone Star Industries, Inc. v. Secretary, Kansas Dept. of Transp.,* 234 Kan. 121, 131, 671 P.2d 511 (1983).

The landowners next argue the trial court erred in instructing the jury as follows:

"INSTRUCTION NO. 5

"In this case the condemnor has taken a right-of-way easement for the purpose of constructing and maintaining a public street. This easement will be permanent.

"The condemnor has also taken a temporary construction easement which is defined in the condemnors petition as follows:

"(b) 'Temporary construction easement' means a temporary easement for the purpose of surveying, excavating, filling, grading and all other purposes incidental to the construction of a street or sidewalk on the permanent right-of-way adjacent thereto substantially as shown on the 'Plans for Street Improvement, 75th Street, City of Shawnee, Kansas,' prepared by Howard, Needles, Tammen & Bergendoff and identified as Project No. 46-U-0571-01-M-2760 (003) and consisting of sheets numbered 1 through 9, a copy of which is marked 'Exhibit A' and filed with the City Clerk of the City of Shawnee. All areas disturbed are to be restored by replacement of sod or pavement to a condition as good as or better than before. No trees or improvements are to be damaged or removed excepting those indicated on the plans aforedescribed. No part of any building or structure, including any eaves, awnings or other overhanging attachment, either within or partly within said temporary easement, shall be damaged or removed unless indicated on the plans aforedescribed. *Said temporary easement shall expire two (2) years from the date of the filing of the Appraiser's Report herein or ninety (90) days after completion and acceptance of the project by the City, whichever occurs first.* The owners, tenants, lienholders and easement holders, their heirs and assigns, may cultivate and fully use and enjoy the land within the construction easement, provided such use shall not interfere with the construction of the street.

"This easement was temporary, and expired on October 29, 1987, two years after the taking."

The landowners object to the emphasized portion of the instruction because it refers to the appraisers' report. The landowners argue that, because the jurors were thus informed that court-appointed appraisers had previously considered the case, the de novo characteristics of a jury trial were destroyed. The jury may not be told the amount of an award made by court-appointed appraisers or be told that an expert who testifies as to value was a court-appointed appraiser. *McCall Service Stations, Inc. v. City of Overland Park,* 215 Kan. 390, 401, 524 P.2d 1165 (1974); *Searcy v. State Highway Comm.,* 145 Kan. 709, 67 P.2d 534 (1937). Otherwise, the jury could conclude the court-appointed appraisers' testimony is entitled to more credence that the other witnesses' testimony. However, there is no rule prohibiting the mere mention of the "appraisers' report," without disclosure of the award or identity of the appraisers. The only possible prejudice from the instruction is the implication that the temporary easement might have lasted less than two years. As the landowners point out themselves, the court removed the possibility of confusion on this point by the. last sentence in the

instruction, stating the easement ended two years after the taking. This issue is without merit.

The next issue is whether the trial court erred in allowing the landowners' representative to be asked whether he sought assurances of access to the property during the period of the temporary easement. Because he had not, the landowners argue this allowed the implication they failed to mitigate their damages.

The trial court ruled as a matter of law prior to trial that the condemnor had the right to prohibit access during the entire two years of the temporary easement. The trial court had therefore, earlier in the trial, prohibited the landowners' representative from testifying that the language of the petition did not assure access. The point had been won, and such testimony would be irrelevant. It was therefore, absent other circumstances, also irrelevant whether the landowners had *sought* assurances of access from the condemnor.

However, the trial court did not err in allowing the question, because the landowners had introduced the topic of assurances of access. See *Dewey v. Funk*, 211 Kan. 54, 56-57, 505 P.2d 722 (1973). The question was asked only after the landowners introduced evidence of comparable sales on 75th Street. The landowners' witness stated some of the sales which occurred after the construction began were for higher amounts than the landowners would receive because the owners of these other properties had been assured of access. The witness testified this factor made it possible for him to estimate the value of the landowners' property before the taking. Any prejudice was cured by the trial court's instruction to the jury to compensate the landowners as if all access to their property was blocked for two years. The jury received no instruction on mitigation.

The final issue is whether the trial court erred in refusing to strike comments made by the City's attorney in closing argument. The relevant portion of the transcript reads as follows:

"[City's Attorney]: First of all, traffic was going to be disrupted in the area because of the 75th Street and I-35 interchange removal. Now, access across this easement isn't very important if there aren't any cars on the street.

"[Landowners' Attorney]: Your Honor, I am going to object to that; that assumes facts which are not in evidence. There's no evidence there weren't going to be cars going by this property.

"[The Court]: Overruled. It's argument."

The landowners' primary objections to these comments relate back to their earlier arguments that there was insufficient foundation for the real estate expert's testimony that traffic would be greatly reduced by the state's construction. Having found no error in the testimony itself, we find no error in commenting on the testimony in closing argument. True, there was no previous evidence there would be *no* traffic by the landowners' property, as the City's attorney acknowledged when he continued his argument after landowners' objection: "I say if. Obviously, there were cars going by the property."

In *State v. Potts,* 205 Kan. 47, 53-54, 468 P.2d 78 (1970), we stated:

" 'In summing up a case before a jury, counsel may not introduce or comment on facts outside the evidence, but reasonable inferences may be drawn from the evidence and considerable latitude is allowed in the discussion of it in which he may use illustrations and appeal to the jury with all the power and persuasiveness which his learning, skill and experience enable him to use.' "

We recognized in *Skelly Oil Co. v. Urban Renewal Agency,* 211 Kan. 804, 807, 508 P.2d 954 (1973), that the "latitude permitted counsel in closing argument lies largely within the discretion of the trial court." The trial court did not abuse its discretion.

The judgment of the trial court is affirmed.