(828 P.2d 1335)

No. 66,449
66,450
66,451

CANDELARIO RODRIGUEZ, *Claimant/Appellant,* v. HENKLE DRILL-
ING AND SUPPLY CO. and THE KANSAS WORKERS COMPENSATION
FUND, *Respondents/Appellees.*

VICTORIA RODRIGUEZ, *Claimant/Appellant,* v. HENKLE DRILLING
AND SUPPLY CO. and THE KANSAS WORKERS COMPENSATION
FUND, *Respondents/Appellees.*

Petition for review denied June 3, 1992.

Opinion filed April 3, 1992.

*Gregory G. Lower*, of Cassell & Lower, of Wichita, for appellants.

*Gary A. Winfrey* and *Donald N. Peterson II*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, for appellee Henkle Drilling & Supply Company.

*Cortland Q. Clotfelter*, of Joseph, Robison & Anderson, P.A., of Wichita, for appellee Kansas Workers Compensation Fund.

Before BRISCOE, C.J., ELLIOTT and LARSON, JJ.

LARSON, J.: Victoria Rodriguez, surviving wife of Candelario Rodriguez, appeals the trial court's confirmation of the Director of Workers Compensation's decision affirming the administrative law judge's rulings in three consolidated workers compensation claims.

The first claim arose out of Candelario's injury to his right knee while performing services on an irrigation well for his employer, Henkle Drilling & Supply Co. (Henkle), in September of 1985.

He experienced pain and surgery was scheduled for April of 1986, but he continued to work at Henkle. His treating physician, Dr. John Gilbert, diagnosed the injury to the knee as a degenerative joint disease and opined a 15 percent disability rating.

The second injury occurred in March of 1986. The drive shaft on an irrigation engine engaged, causing a co-worker's wrench to strike and break Candelario's left forearm. The fracture was reduced with a bone graft from Candelario's left hip. Dr. Gilbert testified that Candelario's arm fracture resulted in a 20 percent disability rating.

The administrative law judge made awards, which were approved by the Director and the trial court, based on two separate scheduled injuries of 15 percent loss of function of the right knee and 20 percent loss of function of the left arm.

On November 23, 1988, Candelario committed suicide. Victoria, his surviving wife, filed a workers compensation claim, contending the suicide was caused by a mental disturbance arising from the knee and forearm injuries. The administrative law judge ruled the suicide was not compensable. This ruling was affirmed by the Director and the trial court.

Victoria appeals in all three cases. We are considering them together on appeal.

These cases involve questions of burden of proof, negative findings, and sufficiency of evidence and issues of law. We first

set forth the rules by which we are bound in review of workers compensation matters.

The claimant has the burden of proof to establish the right to an award of compensation and to prove the various conditions on which the claimant's right depends. K.S.A. 1991 Supp. 44-501(a).

" 'Burden of proof' means the burden of a party to persuade the trier of facts by a preponderance of the credible evidence that such party's position on an issue is more probably true than not true on the basis of the whole record." K.S.A. 1991 Supp. 44-508(g).

"In workers compensation cases, the scope of review by an appellate court is to determine whether the district court's judgment is supported by substantial evidence." *Baxter v. L.T. Walls Constr. Co.*, 241 Kan. 588, 591, 738 P.2d 445 (1987).

"An appellate court may substitute its judgment on questions of law but, on disputed issues of fact, the appellate court 'must view the evidence in the light most favorable to the prevailing party and determine whether there is substantial competent evidence to support the findings of the trial court.' [Citations omitted.]" *Reeves v. Equipment Service Industries, Inc.*, 245 Kan. 165, 173, 777 P.2d 765 (1989).

"A negative finding indicates that the party upon whom the burden of proof is cast did not sustain the requisite burden, and on appeal the negative finding will not be disturbed absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice." *EF Hutton & Co. v. Heim*, 236 Kan. 603, 610, 694 P.2d 445 (1985).

The scope of our review has not been changed by the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et. seq.*, which codified existing case law. *Williams v. Excel Corp.*, 12 Kan. App. 2d 662, 664, 756 P.2d 1104 (1988).

*The trial court did not err in awarding compensation based upon two scheduled injuries as opposed to a general bodily disability.*

We first point out that the knee and arm injuries involved herein occurred prior to July 1, 1987. Any amendments made by the legislature effective after that date, including the addition of subsection (23) to K.S.A. 44-510d(a), are not applicable to the consideration of the compensation to be awarded for these injuries.

Victoria contends the trial court erred in failing to treat the separate and distinct injuries to the knee and forearm as one single injury to the body as whole. Her argument is based on K.S.A. 44-510c(a)(2), which states: "Loss of both eyes, both hands, both arms, both feet, or both legs, or any combination thereof, shall, in the absence of proof to the contrary, constitute a permanent total disability."

Both parties acknowledge this statute has been extended by case law to allow compensation for partial general disability of the body as whole under K.S.A. 44-510e. See *Hardman v. City of Iola*, 219 Kan 840, 844, 549 P.2d 1013 (1976); *Honn v. Elliott*, 132 Kan. 454, 295 Pac. 719 (1931).

Our court extended the rule of *Honn* and *Hardman* in *Downes v. IBP, Inc.*, 10 Kan. App. 2d 39, 40-41, 691 P.2d 42 (1984), *rev. denied* 236 Kan. 875 (1985), by holding that simultaneous injury to both hands of the claimant, caused by repetitive use—not a single traumatic event, removed the injury from the schedule of 44-510d and allowed compensation for a general bodily disability.

The Kansas Supreme Court adopted the reasoning of *Downes* in *Murphy v. IBP, Inc.*, 240 Kan. 141, 144-45, 727 P.2d 468 (1986), by holding that simultaneous aggravation to both arms and hands through repetitive use removes the disability from a scheduled injury and converts it to a general bodily disability. This was allowed even though the injuries did not manifest symptoms simultaneously. The fact that the aggravation occurred simultaneously was sufficient to turn the scheduled injuries into a general bodily disability.

Victoria attempts to bring herself under the umbrella of these decisions. She cannot do so because of the factual basis for the claims.

It is clear in this case that there were two isolated instances approximately six months apart which caused traumatic and sudden injury to separate and distinct scheduled members of Candelario's body.

Victoria's attempts to overcome this clear distinction by arguing that Candelario's knee injury continued to degenerate and was aggravated simultaneously by the injury to his arm are not supported by the medical testimony.

Dr. Gilbert testified that Candelario did not report any aggravation of the injury to his right knee by the 1986 accident to his forearm. He also testified the forearm and knee injuries were separate incidents. The factual evidence does not show simultaneous aggravation. The two injuries were the result of totally independent, separate, and distinct traumatic occurrences which cannot be tied together to produce an award of general bodily disability.

In *Crouse v. Wallace Manufacturing Co.*, 207 Kan. 826, 486 P.2d 1335 (1971), the claimant sustained a non-industrial injury to his left hand with resulting permanent partial disability. Seven years later, the claimant sustained a industrial injury and permanent partial disability to his right hand. The claimant attempted to make the same argument as Victoria does herein. *Honn* was distinguished because it involved simultaneous injuries where in *Crouse* there were separate scheduled injuries. The court held:

"The provisions of the workmen's compensation act are clear and limit benefits in instances of partial disability to scheduled members of the body to the amount provided by the schedule. When a specific injury and disability is a scheduled injury under the workmen's compensation act, the benefits provided under the schedule are exclusive of any other compensation." 207 Kan. 826, Syl. ¶ 3.

The trial court was correct, as a matter of law, in refusing to turn the two separate injuries into a general bodily disability. The awards for scheduled injuries were properly entered.

*The trial court did not err in refusing to award compensation for a hip injury caused by the surgical harvesting of a section of the hip bone for transplanting into claimant's forearm.*

Victoria contends Candelario was entitled to a permanent partial disability award by virtue of the fact the bone graft material was taken from the left iliac crest in his hip in order to repair the left forearm.

Victoria claims the evidence is sufficiently similar to that of *Quinones v. MBPXL Corp.*, 10 Kan. App. 2d 284, 285, 697 P.2d 891 (1985), to require the allowance of a general bodily disability. In *Quinones*, a claimant sustained an injury to his right arm and in the course of treatment a nerve was transplanted from his left leg. This resulted in an area devoid of feeling, and our court held

the loss of sensation made the worker less employable since he could not feel cold, heat, or any sensation of pain.

Candelario testified in his deposition on October 24, 1988, to suffering pain and discomfort from the donor site, which was aggravated by tight underwear and the belt line on his trousers.

Dr. Gilbert testified this procedure was normal and that the claimant did not suffer any physical restrictions. Dr. Gilbert further testified the claimant did not minimize his complaints. There was no evidence that the claimant suffered any impairment or permanent injury as a result of the bone graft.

The trial court ruled in this case that there was insufficient evidence to support any finding of disability. This is a negative finding, and there is no uncontroverted evidence or showing of prejudice or malice toward the finder of facts. We will not set aside this negative finding. See *Box v. Cessna Aircraft Co.,* 236 Kan. 237, 246, 689 P.2d 871 (1984).

*The trial court properly found that Candelario's suicide was not compensable.*

K.S.A. 1991 Supp. 44-501(d) provides:

"If it is proved that the injury to the employee results for the employee's deliberate intention to cause such injury, . . . or substantially from the employee's intoxication, any compensation in respect to that injury shall be disallowed. The employer shall not be liable under the workers compensation act where the injury, disability or death was substantially caused by the employee's use of any drugs, chemicals or any other compounds or substances, including but not limited to, any form or type of narcotic drugs, marijuana, stimulants, depressants or hallucinogens."

While the literal application of the above wording would preclude the award of compensation, most jurisdictions in the United States have judicially created an exception to such a harsh rule.

The efforts of diligent counsel and our research have revealed only one Kansas workers compensation case, *Gardner v. Ark Warehouse Co.,* 148 Kan. 190, 80 P.2d 1066 (1938), where a suicide was claimed to be compensable. *Gardner* was decided on the narrow issue that no questions of law were presented for review and is without precedential assistance to us in this case.

A brief history of the development of the current majority rule is found in 1A Larson's Workmen's Compensation Law § 36.10, p. 6-162 (1990):

"At one time the field was dominated by the voluntary wilful choice test, sometimes called the rule in *Sponatski's Case* [, 220 Mass. 526, 108 N.W. 466 (1915)], under which compensation in suicide cases was not payable unless there followed as the direct result of a physical injury an insanity of such violence as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy without conscious volition to produce death. This doctrine was gradually displaced as majority rule by the chain-of-causation test, which found compensability if the injury caused the deranged mental condition which in turn caused the suicide."

The excellent annotation "Workmen's Compensation—Suicide," 15 A.L.R.3d 616, § 5, p. 631 (1967) defined the chain-of-causation rule as

"where the injury and its consequences directly result in the workman's loss of normal judgment and domination by a disturbance of the mind, causing the suicide, his suicide is compensable. This rule rejects the tort liability concept of fault (which stresses the independent intervening cause), and the criminal-law standard of insanity (which requires that the person not know what he is doing), substituting therefor the 'chain-of-causation' or 'but for' test and the requirement of an uncontrollable 'compulsion' to commit suicide."

In attempting to reduce problems of causation to its simplest terms, Professor Larson states:

"Discussion of the suicide defense is simplified, however, by the fact that, whatever the approach taken, the ultimate rule of law appears to be the same. The issue boils down to one of proximate versus independent intervening cause." 1A Larson's Workmen's Compensation Law § 36.10, p. 6-161.

All of the parties to this appeal are in agreement that Kansas should adopt the chain-of-causation test, under which the following questions are raised:

(1) Was there initially a work-related injury as defined in K.S.A. 1991 Supp. 44-501(a)?

(2) Did the work-related injury directly cause Candelario to become dominated by a disturbance of the mind of such severity as to override normal rational judgment?

(3) Did this disturbance result in Candelario's suicide?

These are the same issues framed by the Ohio Supreme Court in *Borbely v. Prestole Everlock*, 57 Ohio St. 3d 67, 565 N.E.2d 575 (1991), and the Pennsylvania Supreme Court in *Globe Sec. Systems Co. v. W.C.A.B.*, 518 Pa. 544, 544 A.2d 953 (1988).

In *Matter of Death of Stroer*, 672 P.2d 1158, 1161 (Okla. 1983), the Supreme Court of Oklahoma discussed the chain-of-causation test in this manner:

"Although 85 O.S.1981 § 11 provides that benefits are not allowable for an employee's intentionally self-inflicted injury, suicide does not automatically preclude compensation. . . . The majority of jurisdictions whose workers' compensation statutes contain an exclusion for wilful or intentional injury have adopted the chain of causation test as the criterion for interpreting the term 'wilful', 'purposeful' or 'intentional'. This standard best reflects the socio-economic purpose of the Workers' Compensation Act.

"Under this rule, an employee's death by suicide is compensable if the original work-related injuries result in the employee's becoming dominated by a disturbance of mind directly caused by his/her injury and its consequences, such as extreme pain and despair, of such severity as to override normal or rational judgment. The act of suicide is not an intervening cause of death and the chain of causation is not broken in cases where the incontrovertible evidence reflects that, but for the injury, there would have been no suicide . . . . *The chain of causation rule places the burden on the claimant to prove by a preponderance of the evidence that there was an unbroken chain of causation between the compensable injury, the disturbance of mind, and the ultimate suicide.*" (Emphasis added.)

We approve the adoption of the chain-of-causation test in Kansas to determine whether the suicide of a worker may be compensable. It then becomes necessary to determine if the legal principles set forth above were properly applied.

The respondent and the Fund argue that the claimant failed to prove Candelario suffered from a mental disturbance or, if there was a mental disturbance, that it was caused by the work injuries. Victoria argues vigorously that the trial court erroneously required proof that the injuries were severe and extreme rather than that disturbance of the mind was severe and extreme.

The facts as viewed by the claimant differ greatly from the contentions of the respondent and the Fund.

Victoria claims the evidence showed Candelario was a man in constant physical pain, who felt worthless because of his inability to work, who underwent radical mood swings and personality changes due to his suffering, and who sank into depression, despair, and hopelessness culminating in suicide. This evidence primarily came from family members, but included opinions of Dr. Jeffrey Lane and Dr. Leslie Ruthven, who performed psychological autopsies on Candelario.

There was other evidence which strongly suggested that factors other than Candelario's injuries brought him to suicide. He was experiencing severe marital difficulties. His wife had left him on two occasions during the final six weeks of his life. The last time was 13 days prior to his death when Victoria had gone to Texas to see her mother because Candelario wanted to kill her, himself, and their daughter.

On the day of his suicide, Candelario telephoned Victoria, begged her to return the next day so they could be together on Thanksgiving, and threatened to kill himself if she did not do so. Victoria said she would return two days later. The parties became angry and Victoria hung up. Less than two hours later, Candelario called for Victoria again and was extremely upset when told she was not there. His son's girlfriend testified he was extremely agitated and immediately thereafter took his own life.

A KBI investigation revealed Candelario had a blood alcohol concentration of .18 and had cocaine in his blood at the time of his death. Testimony showed Candelario had a long-term alcohol problem and had previously used threats of suicide in attempting to manipulate his family.

The respondent and the Fund's psychological expert, Dr. T.A. Moeller, questioned the validity of psychological autopsies and opined there was an insufficient basis upon which to determine the cause of the suicide.

The trial court in its opinion stated:

"[I]t is clear that Mr. Rodriguez sustained severe pain as a consequence of his two previous work-related injuries, also that he acted depressed and despondent. The troublesome inquiry, however, suggests that the cause of his mental state is unclear. The record reflects that he also incurred marital and family problems to the extent that his wife and

children left the home. These problems appear to be disassociated to his previous injuries and had persisted throughout his marriage. In addition, alcohol and controlled substances entered into Mr. Rodriguez's life, both of which were found in his blood subsequent to his death. Alcohol in particular had continued to be a major problem for Mr. Rodriguez and predated the injuries sustained while employed by respondent.

. . . .

"The Court in light of the preceding findings, together with the nature of the psychological autopsies of the experts, the questionable objectivity, and lack of a preponderance of the evidence establishing a direct causal connection between his previous injuries and his suicide, must conclude that the claim in this instance was properly denied. This is not to say that such previous injuries and subsequent associated pain and distress was not a factor; however, contemplated by the rule, the evidence must show it to be of such an extreme and of such severity as to dominate Mr. Rodriguez's mental state as to be considered a disturbance of the mind. This the evidence failed to do."

These are negative findings. Our review of the record clearly shows the trial court was justified in finding the claimant failed to sustain the requisite burden of proving the chain of causation to make the suicide a compensable event.

There was also substantial evidence the suicide was caused by a myriad of factors other than a mental disturbance arising from the injuries. Much of the direct evidence showed that the suicide resulted from the effects of alcohol, drugs, and marital discord.

We disregard as improvident and harmless the statement of the trial court concerning the fact Candelario was not employed at the time of his death as being any factor in the decision regarding whether the chain-of-causation test was met. The trial court's opinion properly hinges the suicide claim back to the on-the-job injuries. Its decision was not reached based on an incorrect legal premise.

We do not deem it necessary to attempt to distinguish or harmonize the large number of cases from other jurisdictions cited by both sides. They have all been considered as have all other contentions of the claimant and are not found to affect our decision.

*The opinion of Dr. T.A. Moeller was properly considered.*

An inordinate part of claimant's brief is directed to a claim that it was reversible error for the administrative law judge

and trial court to consider the testimony of Dr. T.A. Moeller, a professor of clinical psychology. All of these contentions are without merit.

The admission of expert testimony is a matter within the discretion of the trial court. *Hudson v. City of Shawnee*, 246 Kan. 395, Syl. ¶ 10, 790 P.2d 933 (1990). The Kansas Supreme Court in *Box v. Cessna Aircraft Co.*, 236 Kan. at 243-44, in discussing the admission of evidence in a workers compensation case, said: "The rules of evidence, K.S.A. 60-401 *et seq.*, are not applicable in workers' compensation proceedings. [Citations omitted.] The admissibility of evidence is more liberal in compensation cases, not more restrictive."

Expert testimony may properly be admitted to challenge the scientific theory and methodology which underlie another expert's opinion. See *e.g., State v. Hodges*, 241 Kan. 183, 185-89, 734 P.2d 1161 (1987).

The four allegations of error made by the claimant have been considered. No abuse of discretion was shown in allowing the testimony of Dr. Moeller to be considered by the administrative law judge and the trial court.

Affirmed.