No. 52,401

STATE OF KANSAS, *Appellee,* v. DANNY R. ROUSE, *Appellant.*

(629 P.2d 167)

Opinion filed June 10, 1981.

*Harry L. Eddy,* of Wichita, argued the cause and was on the brief for the appellant.

*Beverly Dempsey,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Clark V. Owens,* district attorney, were with her on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict finding Danny R. Rouse (defendant-appellant) guilty of first-degree murder (K.S.A. 21-3401) and aggravated battery (K.S.A. 21-3414). On appeal the appellant contends it was error for the trial court to (1) instruct the jury regarding the appellant's

insanity defense using the *M'Naghten* rule, (2) permit a police informant to testify against the appellant, and (3) permit improper comment by the prosecutor during closing argument.

On Sunday, October 28, 1979, the appellant was a visitor in the home of Kathryn Crowley, in Wichita. Kathryn lived in a duplex with her five-year-old son Jason Learst. The appellant had previously visited Kathryn at her apartment on four or five occasions during the preceding four months. Kathryn and the appellant were not romantic friends, and did not date. They first became acquainted through mutual friends in March 1979.

The appellant arrived at Kathryn's home near 8 o'clock p.m. He brought some beer, and they each drank two. They also smoked two marijuana "joints." They talked and watched a movie, "One Flew Over the Cuckoo's Nest." Jason was asleep in his bedroom during the evening.

Shortly after the movie ended the appellant made a verbal sexual pass which Kathryn declined. The appellant soon announced his intention to leave and told Kathryn he would take the remaining beer. As Kathryn was reaching into the refrigerator she was struck from behind and repeatedly stabbed by the appellant. Kathryn pretended she was dead by going limp and falling to the floor. The appellant left Kathryn in the kitchen and walked into Jason's bedroom. The appellant killed Jason by cutting the boy's throat.

The appellant went into the bathroom, and washed blood from his knife and himself. He returned to the kitchen and retrieved the empty beer cans from the trash bag. He turned off the television, pulled down several window shades, turned off the lights, and departed after locking the front door. Kathryn stumbled and crawled out of her apartment to the front door of her neighbor's apartment, and told the neighbor to call the police.

After leaving Kathryn's apartment, the appellant returned to his own home, packed personal items and clothing in a backpack, and went to the home of his friends, Phil and Mary Michaud. A few weeks earlier, the Michauds had offered to buy the appellant's 1967 Mercury Cougar. The appellant told the Michauds that his mother had suffered a stroke, and he was going to Chicago by bus to be with her. The appellant sold his 1967 Cougar for $100 and signed over the title to the Michauds. He wrote a bill of sale and accepted $20, which was all the cash the

Michauds then had on hand. The Michauds drove the appellant to the bus station and returned home. They testified the appellant seemed nervous, but never mentioned his evening activities. The appellant was arrested the next day in Bolivar, Missouri, and returned to Wichita.

One week after his arrest, the appellant was visited in jail by Reverend Gaylan Grant. Reverend Grant continued to visit the appellant approximately once a week until the time of trial. At trial the appellant waived the penitential communication privilege and Rev. Grant testified. Grant testified that the appellant was scared, disturbed, and needed help. Grant offered spiritual counseling. The appellant told Grant that he was in an isolation cell because other prisoners had told him that he was a dead man because he had killed a child. Nevertheless, the appellant desired to have a cellmate. The appellant had been able to shower, but could not obtain a change of clothes, or a light bulb for his cell. Grant testified that he (Grant) told the jail receptionist about the clothes and light bulb. Grant estimated the request was not answered for at least one week, perhaps two. The appellant told Grant that he remembered very little about the crime. The appellant remembered being in the apartment, smoking marijuana and drinking beer. He remembered grabbing Kathryn from behind, but could remember nothing after that. He could not remember killing Jason.

During portions of the month of April 1980, the appellant shared a Sedgwick County jail cell with Bobby Carr. The State called Carr to testify at trial. Carr testified that despite his admonition not to do so, the appellant talked about the crime. The appellant told Carr about going over to a lady's house, smoking dope with her, and then asking her to have sex. Upon being rejected, he got mad and started stabbing her; the appellant thought he had killed her. He then went into the bedroom and killed the little boy to make sure the boy could not testify that the appellant had been there that night. The appellant told Carr that he had put the little boy to bed earlier the same evening. Carr also testified the appellant said he was going to plead insanity and claim he did not remember what occurred.

The appellant offered testimony from a clinical psychologist, Dr. Robert Schulman, and a medical doctor specializing in psychiatry, Dr. Herbert C. Modlin, to support his defense of legal insanity at the time of the offenses.

The appellant was examined by both doctors in November 1979, one month after the offenses. Dr. Modlin diagnosed the appellant as schizophrenic, noting he had great inhibitions and difficulties in sexual relations which, when under stress, could trigger violence. Such violence would be a reflex action, and would not be guided by a concept of right and wrong.

The appellant told Dr. Modlin that he had maintained a superficial relationship with the victims. He explained the rejected sexual advance, and expressed no surprise; nor did he place any importance on the rejection. The appellant told Modlin he vaguely recalled beginning to attack Kathryn, but next recalled being in his own apartment in bloodstained clothes. Modlin opined that at the time of the offense, the appellant could not tell right from wrong.

The State asked Dr. Modlin whether his opinion would change regarding the appellant's ability to distinguish right from wrong if he were told the appellant pulled down window shades, went into the boy's bedroom and cut his throat, washed up in the bathroom, took beer cans out of the trash, turned off lights and television, and locked the door as he left. The State also asked whether Dr. Modlin would change his opinion if he knew the appellant went to a friend's home and negotiated the sale of an automobile, correctly signing the title and writing a bill of sale, all within an hour and one-half of the offenses. Dr. Modlin stated that those additional facts would cast doubt on his prior opinion, indicate an appreciation of wrongfulness, and would probably change his opinion.

Dr. Schulman also diagnosed the appellant as a schizophrenic, and opined that the appellant was not conscious of the rightness or wrongness of his behavior at the time of the attack. Schulman felt the acts of pulling window shades, turning off lights and television, and locking the door were routine mechanical acts and not indicative of consciousness of wrongdoing. He stated that the act of retrieving the beer cans might indicate the appellant's appreciation of wrongness.

The appellant testified on his own behalf, substantially consistent with what he had told Rev. Grant, Dr. Modlin and Dr. Schulman. The appellant related details of his troubled youth and recent transient past. He explained his regular use of drugs like

Quaaludes, Valium, marijuana, and alcohol; he occasionally ingested LSD or hallucinogenic mushrooms. The appellant explained how he became acquainted with the victims. When the appellant first moved to Wichita in March 1979, he lived for ten days with his sister and brother-in-law, Zina and Michael Yardley. During the same period Kathryn Crowley was temporarily living in the Yardley home with Bill Yardley, Michael's brother. The appellant and Jason Learst slept in the Yardley's living room.

The appellant testified he drank beer, and ingested several Quaaludes during the 24 hours prior to arriving at Kathryn's apartment. He could remember arriving at Kathryn's apartment, drinking beer, smoking marijuana, talking, and watching the movie. He testified he was not upset by the rejection of his sexual advance. He could not remember attacking Kathryn, or any other action at her apartment. He next remembered arriving at the Michauds' home. He recalled his feeling that he must have done something bad, because his hand was cut and bleeding, and he had blood on his clothes. The appellant testified he asked Phil Michaud to take him to the police station, but Michaud refused. The appellant claimed Phil Michaud told him to leave town.

The jury convicted the appellant of one count of aggravated battery and one count of first-degree murder. Appeal has been duly perfected.

The appellant first contends the trial court erred in instructing the jury in accord with the *M'Naghten* rule. The appellant specifically asked the trial court to instruct the jury using the American Law Institute Model Penal Code definition of criminal responsibility, which is quoted in *State v. Smith,* 223 Kan. 203, 207, 574 P.2d 548 (1977). The appellant raises the same objections to the *M'Naghten* rule as were discussed and rejected in *Smith,* 223 Kan. at 207-11. In *State v. Levier,* 226 Kan. 461, 465, 601 P.2d 1116 (1979), the majority of this court reaffirmed retention of the *M'Naghten* rule. Appellant's claim of error has no merit. The court adheres to the *M'Naghten* rule.

The appellant contends the trial court erred in permitting Bobby Carr to testify about statements made by the appellant when they were cellmates. The appellant contends Carr was a police informant and his testimony should have been barred under the ruling in *State v. McCorgary,* 218 Kan. 358, 362, 543 P.2d 952 (1975), *cert. denied* 429 U.S. 867 (1976), following

*Massiah v. United States,* 377 U.S. 201, 12 L.Ed.2d 246, 84 S.Ct. 1199 (1964).

In *McCorgary,* 218 Kan. at 361-62, the court stated:

"Before examining the question it should be noted the exclusionary rule declared in *Massiah* does not apply to voluntary statements of a defendant which are made to private citizens. (*People v. Smith,* 5 Ill. App. 3d 642, 283 N.E.2d 736.) It has been held that if a defendant is injudicious in his conversations with fellow prisoners and the latter without prior arrangements with the police take it upon themselves to tell police officials of these conversations such conversations are admissible in evidence. (*United States v. Aloisio,* 440 F.2d 705 [7th Cir. 1971], cert. den. 404 U.S. 824, 30 L.Ed.2d 51, 92 S.Ct. 49; *United States v. Casteel,* 476 F.2d 152 [10th Cir. 1973]; *Milani v. Pate,* 425 F.2d 6 [7th Cir. 1970], cert. den. 400 U.S. 867, 27 L.Ed.2d 107, 91 S.Ct. 109.)

. . . .

". . . When the police or other state officers surreptitiously place a defendant in a cell with an informer for the purpose of obtaining information concerning pending charges in the absence of counsel, such action by the police contravenes the basic dictates of fairness in the conduct of criminal causes and violates the fundamental rights afforded by the presence of counsel.

"The testimony of a police informer concerning incriminating statements made by the defendant while in jail pending charges is not admissible at defendant's trial if the information has been surreptitiously obtained by prior arrangements between the police and the informer."

The appellant contends he was subjected to physical and mental torture because he was denied a light bulb in his jail cell, and was unable to obtain a change of clothes, for a period of about two weeks. The testimony of Rev. Grant tends to corroborate the appellant's claim of denial of light bulb and fresh clothing. The appellant contends that after two weeks of such "physical and mental torture," he was placed in a cell with Carr. He claims Carr was told the facts of the crime by members of the district attorney's office, and that he (the appellant) never made some of the statements attributed to him by Carr, and that Carr was placed in the cell in order to act as an informant in return for leniency in plea bargaining of other pending cases.

The appellant's claim of physical and mental torture has no merit. The alleged deprivation falls far short of cruel and unusual punishment under section 9 of the Kansas Bill of Rights, or the 8th Amendment to the United States Constitution. There is nothing about the alleged deprivation which is shocking to the conscience or which seems inhumane or barbarous. See generally *State v. Coutcher,* 198 Kan. 282, 288, 424 P.2d 865 (1967).

In *Levier v. State,* 209 Kan. 442, Syl. ¶ 2, 497 P.2d 265 (1972),

we stated that the rights of an inmate include entitlement to adequate food, light, clothing, medical care and treatment, sanitary facilities, reasonable opportunity for physical exercise and protection against physical or psychological abuse or unnecessary indignity. We note that the State does not deny the testimony of Rev. Grant or the appellant in regard to the absence of lighting and fresh clothing. It would be improper if the appellant was knowingly or intentionally deprived of those items for a long period of time. However, we also note the appellant's discomfort was of limited duration, and his remedy in any case would be the termination of such conditions. See *Levier v. State,* 209 Kan. at 442, Syl. ¶ 3. The appellant has failed to equate the alleged deprivation with mental and physical torture. Nor has the appellant demonstrated that the jail conditions were an attempt to "soften him up" prior to placing him in a cell with Carr.

The trial court held a hearing (K.S.A. 22-3215) and determined there was no factual basis to support the appellant's claim that the police had prearranged for Carr to obtain information from the appellant. The trial court held the appellant's statements were freely and voluntarily made.

There is no evidence in the record to support the appellant's allegation that he was surreptitiously placed in the cell with Carr in order that Carr could obtain information about the pending charges. The appellant had asked to be placed in a cell with someone. The district attorney, the chief deputy district attorney, and an assistant district attorney testified that they were associated with the prosecution and the plea bargaining with Carr. All three men denied that they instructed or arranged for Carr to act as an informant against the appellant, prior to placing the appellant in Carr's jail cell. The jailer in charge of the Sedgwick County Jail testified that no district attorney, sheriff, police officer, or public official requested the move. Carr testified and denied any prior arrangement in regard to the appellant. Both Carr and the appellant testified that Carr specifically told the appellant not to talk about the offenses. Carr acted as an informant for the district attorney's office in relation to crimes in Kansas and Oklahoma to which the appellant was unconnected.

The trial court properly admitted Carr's testimony and left for the jury the matter of assigning weight and credibility to Carr's testimony.

Finally, the appellant contends the State made improper comments in closing argument. Specifically, he contends the testimony of Dr. Modlin was distorted. The closing arguments were not transcribed, therefore we do not have a proper record on appeal to determine the issue. It is incumbent upon the appellant to include in the record on appeal any matter upon which he intends to base a claim for relief. *State v. Wilson & Wentworth,* 221 Kan. 359, Syl. ¶ 4, 559 P.2d 374 (1977). We do not have the text of the prosecutor's remarks, nor do we have any indication the appellant lodged a contemporaneous objection. K.S.A. 60-404. The rule is well settled that reversible error cannot be predicated upon a complaint of misconduct of counsel in closing argument where no objection is lodged. *State v. Watkins,* 219 Kan. 81, 87-88, 547 P.2d 810 (1976).

The judgment of the lower court is affirmed.

PRAGER, J., dissenting:

I respectfully dissent from that portion of the opinion which rejects the American Law Institute Model Penal Code definition of criminal responsibility and adheres to the *M'Naghten* rule. The reasons for my position are discussed in detail in the dissenting opinion in *State v. Smith,* 223 Kan. 203, 211, 574 P.2d 548 (1977). Since *Smith* was decided in December of 1977, the Supreme Court of California in *People v. Drew,* 22 Cal. 3d 333, 149 Cal. Rptr. 275, 583 P.2d 1318 (1978), abolished the *M'Naghten* rule, which had been followed in that state for more than a century, and adopted the rule proposed by the American Law Institute. The opinion by Justice Tobriner in *People v. Drew* presents an excellent discussion of the deficiencies of the *M'Naghten* rule and the manifest superiority of the ALI rule. As I calculate it, the number of states which follow the *M'Naghten* rule has now been reduced from 18 to 17 states. I would reverse and remand the case for a new trial with directions to the trial court to instruct the jury on the ALI standards for legal insanity.