No. 68,452

IVAN THOMPSON, JR., *Appellee,* v. KFB INSURANCE COMPANY, *Appellant.*

(850 P.2d 773)

Opinion filed April 16, 1993.

*Richmond M. Enochs,* of Wallace, Saunders, Austin, Brown and Enochs, Chartered, of Overland Park, argued the cause, and *Lee R. Hardee, III,* of the same firm, was with him on the briefs for appellant.

*Charles S. Fisher, Jr.,* of Fisher, Cavanaugh & Smith, P.A., of Topeka, argued the cause, and *Bryan W. Smith,* of the same firm, was with him on the brief for appellee.

*Timothy A. Short,* of Spigarelli, McLane & Short, of Pittsburg, was on the brief for *amicus curiae* Kansas Trial Lawyers Association.

*Wayne T. Stratton,* of Goodell, Stratton, Edmonds & Palmer, of Topeka, and *John D. Ensley,* of the same firm, were on the brief for *amici curiae* Kansas Hospital Association and Kansas Medical Society.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Ivan Thompson, Jr., brought this action against his automobile insurance carrier, KFB Insurance Company (KFB), claiming underinsured motorist benefits. Thompson sought to recover for personal injuries and damages suffered as a result of an automobile accident. Before trial began, the district court ruled that K.S.A. 1992 Supp. 60-3801 *et seq.,* the current Collateral Source Benefits Act, is unconstitutional. Evidence of collateral source benefits was not admitted at trial. The jury awarded $377,000 to Thompson. The district court made several reductions in the award and entered judgment for him in the amount of $226,150. KFB appeals from the jury verdict and rulings of the district court. This appeal was transferred from the Court of Appeals by order of this court, pursuant to K.S.A. 20-3018(c).

With regard to the circumstances of the accident, there is no dispute. Ivan Thompson was a passenger in his automobile, which was being driven east on Interstate 70 by Joy Burgen. A westbound automobile driven by Verbal Russell crossed the median

and struck Thompson's automobile head-on or nearly so. The accident occurred on May 26, 1990.

Thompson sustained injuries which required treatment and hospitalization in St. Louis, near the place of the accident. Among his attending physicians in St. Louis were a general surgeon, Dr. John Hoehn, and an orthopedic surgeon, Dr. Edwin Carter.

Thompson was treated for rib fractures, a "flail" chest, a collapsed lung, and a comminuted fracture of the left femur. He had five ribs on his left side which had more than one fracture in each. A comminuted fracture involves more than two fragments. X-rays of Thompson's left thigh showed at least eight pieces of bone as well as a V-shaped fracture which extended from just below the hip joint down into the knee joint. Repair is complicated when the knee joint is involved, and there is a greater chance of arthritis in the future.

While in the hospital in St. Louis from May 26 to May 28, Thompson was in the intensive care unit. He was transferred to "the floor" on May 28, and on June 1 he was moved by ambulance to Topeka for surgical fixation of his fracture by Dr. Kurt Knappenberger.

The orthopedic surgery involved stabilizing the alignment and configuration of the femur and knee joint with screws and inserting a rod down the length of the femur. Thompson was released from the hospital within a week after the surgery, which occurred on June 5. On August 24 Thompson was allowed to start placing some weight on his left leg. At the time of trial, November 1991, the rod had not yet been removed from Thompson's leg. Its removal will require surgery, will result in two to three more weeks on crutches, and will cost approximately $3,000.

Thompson owns and drives a dump truck in which he hauls asphalt for a construction company. At the time of trial he was 53 years old. After the accident he modified his truck so that he could operate the clutch with a hand lever which allowed him to return to work sooner than otherwise. He was away from work about 10 weeks. Some mechanical work he previously would have done on his truck he now pays someone else to do. He plans to have the rod removed from his leg during the slow winter months

to avoid missing more work. Additional facts will be stated as relevant to determination of the issues.

We first consider if the current collateral source benefits statutes, K.S.A. 1992 Supp. 60-3801 through 60-3807, are constitutional. Article 38 of Chapter 60 of the Kansas Statutes Annotated is entitled "Collateral Source Benefits." The Act became effective July 1, 1988. K.S.A. 1992 Supp. 60-3801 is the definition section of the Act. K.S.A. 1992 Supp. 60-3806 provides for severability of any invalid clause or provision; K.S.A. 1992 Supp. 60-3807 provides for application of the Act to causes of action which accrue on or after the effective date.

K.S.A. 1992 Supp. 60-3802 through 60-3805 are the operative sections and provide:

"In any action for personal injury or death, in which the claimant demands judgment for damages in excess of $150,000, evidence of collateral source benefits received or evidence of collateral source benefits which are reasonably expected to be received in the future shall be admissible." K.S.A. 1992 Supp. 60-3802.

"When evidence of collateral source benefits is admitted into evidence pursuant to K.S.A. 1992 Supp. 60-3802, evidence of the cost of the collateral source benefit shall be admissible." K.S.A. 1992 Supp. 60-3803.

"In determining damages in an action for personal injury or death, the trier of fact shall determine the net collateral source benefits received and the net collateral source benefits reasonably expected to be received in the future. If the action for personal injury or death is tried to a jury, the jury will be instructed to make such determination by itemization of the verdict." K.S.A. 1992 Supp. 60-3804.

"(a) The amount of the judgment shall be reduced by the court by the amount of net collateral source benefits received, or reasonably expected to be received in the future but only to the extent that such benefits exceed the aggregate amount by which:

(1) Such judgment was reduced pursuant to subsection (a) of K.S.A. 60-258a and amendments thereto;

(2) the claimant's ability to recover such judgment was limited by the application of subsections (c) and (d) of K.S.A. 60-258a and amendments thereto, other than by virtue of claimant's settlement with or decision not to assert a legally enforceable claim against a named or an unnamed party;

(3) the amount to which the claimant's ability to recover such judgment was limited by the insolvency or bankruptcy of a person; and

(4) the award of damages has been reduced because of a statutory limit upon the recovery of damages.

"(b) If there is no amount falling within subsections (a)(1) through (a)(4) then the court shall reduce the judgment by the full amount of the net collateral source benefits." K.S.A. 1992 Supp. 60-3805.

At common law, the collateral source rule prevented the jury from hearing evidence of payments made to an injured person by a source independent of the tortfeasor as a result of the occurrence upon which the personal injury action is based. The court has stated the rule as follows: "Under the 'collateral source rule,' benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer." *Farley v. Engelken*, 241 Kan. 663, Syl. ¶ 1, 740 P.2d 1058 (1987).

Three times in recent memory the Kansas Legislature has enacted statutes which were intended to override or limit the common-law rule. K.S.A. 60-471(a), enacted in 1976, provided in pertinent part:

"In any action for damages for personal injuries or death arising out of the rendering of or the failure to render professional services by any health care provider, evidence of any reimbursement or indemnification received by a party for damages sustained from such injury or death, excluding payments from insurance paid for in whole or in part by such party or his or her employer, and services provided by a health maintenance organization to treat any such injury, excluding services paid for in whole or in part by such party or his or her employer, shall be admissible for consideration by the trier of fact subject to the provisions of subsection (b)."

In *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 701 P.2d 939 (1985), this court held that K.S.A. 60-471 violated the equal protection provisions of the federal and Kansas Constitutions, and in 1985 the statute was repealed. L. 1985, ch. 197, § 5.

Then the legislature enacted K.S.A. 1986 Supp. 60-3403, which provided in pertinent part:

"(a) In any medical malpractice liability action, evidence of the amount of reimbursement or indemnification paid or to be paid to or for the benefit of a claimant under the following shall be admissible: (1) Medical, disability or other insurance coverage except life insurance coverage; or (2) workers' compensation, military service benefit plan, employment wage continuation plan, social welfare benefit program or other benefit plan or program provided by law."

In *Farley v. Engelken,* this court ruled that 60-3403 was unconstitutional, 241 Kan. at 678; in 1988 the statute was repealed, L. 1988, ch. 222, § 8.

In 1988 the legislature enacted K.S.A. 60-3801 *et seq.* L. 1988, ch. 222. In the present case, the district court ruled that the current statutory override of the collateral source rule is unconstitutional, and the question is once more before this court.

The district court's decision rested on equal protection grounds. Pertinent portions of the ruling are as follows:

"There hasn't been any appellate court decisions on this issue. There have been no federal district court decisions on this issue. You did cite that *Gregory* case which went up since. But,—it did deal with this statute—but to me, it gave no hint as to the constitutional question which the plaintiff raises here. Essentially, that that statute violates the equal protection because it treats people differently. It fails to treat people alike. And the only distinction [that] is made is the size of the claim. And as the Court said in *Manzanares* discrimination really isn't the issue. The issue is whether there is a legitimate legislative purpose in creating the discrimination. Frankly, I haven't seen it yet. I haven't seen the purpose of making such a distinction in any brief. The statute is no help. I haven't been submitted any records from committee hearings in the legislature and I have never seen any. So I do not know the reason for it. I would only have to speculate on that. But that's frankly, to my mind, the weakness of the arguments in support of that statute. And that is, that so far, I have not been able to identify any reason for that kind of discrimination. And there not only has to be a reason, there would have to be a sufficient reason. And so, based upon what I know and what has been submitted to me, I am unable to find that there is certainly any sufficient reason, if there is any reason, for the clear, obvious discrimination."

The parties failed to furnish any legislative history to aid the district court in its consideration of the distinction drawn between claims in excess of $150,000 and claims for lesser dollar amounts. Thus, there is nothing in the record on appeal. On appeal, the parties provided us legislative materials with their principal briefs. The Kansas Hospital Association and Kansas Medical Society (KHA/KMS) filed an *amici curiae* brief. After records from committee hearings were appended to that brief and submitted to this court, KFB included some material in appendices to its recently filed reply brief. It should be noted that the materials in these appendices do not conform to the requirement of Supreme Court Rule 6.02(f) (1992 Kan. Ct. R. Annot. 25) that an appendix

consist "of limited extracts *from the record on appeal*." (Emphasis added.)

The district court stated its ruling and its grounds as follows:

"My ruling is it is not constitutional under the equal protection clause and probably not under the Kansas Constitution, definitely not under the Kansas Constitution. I can't give you the section right now. Trying to recall it. But I don't have anything before me and don't want to put the wrong section on the record. So the ruling would be that evidence of collateral sources would be inadmissible."

The district court evidently was referring to § 1 of the Kansas Constitution Bill of Rights: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."

The various levels of scrutiny employed in determining whether a statutory scheme violates equal protection guarantees recently were reviewed by the court in *Stephenson v. Sugar Creek Packing,* 250 Kan. 768, 774-75, 830 P.2d 41 (1992):

"As quoted in *State ex rel. Schneider v. Liggett,* 223 Kan. 610, 613, 576 P.2d 221 (1978), the United States Supreme Court has described the concept of 'equal protection' as one which 'emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable.' *Ross v. Moffitt,* 417 U.S. 600, 609, 41 L. Ed. 2d 341, 94 S. Ct. 2437 (1974). Whether or not the legislation passes constitutional muster depends on the relationship borne by the challenged classification to the objective sought by its creation. . . .

"The examination of the relationship between the classification and the objective has become quite formalized. The United States Supreme Court articulates and applies three degrees of scrutiny when examining the relationship. The various levels of scrutiny were reviewed by this court in *Farley v. Engelken,* 241 Kan. 663, 669-70, 740 P.2d 1058 (1987).

"The least strict scrutiny is referred to as the 'rational basis' test. Relevance is the only relationship required between the classification and the objective. In *McGowan v. Maryland,* 366 U.S. 420, 425, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961), it was explained that '[t]he constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective.' Insofar as the objective is concerned, '[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' 366 U.S. at 426. Thus, it appears that the legislature's purpose in creating the classification need not be established. The classification must, however, bear a rational relationship to a legitimate objective. As noted by Justice Marshall in his dissent in *Lyng v. Automobile Workers,* 485 U.S. 360, 375, 99 L. Ed. 2d 380, 108 S. Ct. 1184 (1988):

'The Court fails to note, however, that this standard of review, although deferential, " 'is not a toothless one.' " *Mathews v. De Castro,* 429 U.S. 181, 185 (1976), quoting *Mathews v. Lucas,* 427 U.S. 495, 510 (1976). The rational-basis test contains two substantive limitations on legislative choice: legislative enactments must implicate legitimate goals, and the means chosen by the legislature must bear a rational relationship to those goals. In an alternative formulation, the Court has explained that these limitations amount to a prescription that " 'all persons similarly situated should be treated alike.' "

"The intermediate level of scrutiny is termed 'heightened scrutiny.' *Farley v. Engelken,* 241 Kan. at 669. 'It requires the statutory classification to substantially further a legitimate legislative purpose.' 241 Kan. at 669. Another, perhaps stronger, statement of the heightened scrutiny test is that the classification 'must serve important governmental objectives and must be substantially related to achievement of those objectives.' *Craig v. Boren,* 429 U.S. 190, 197, 50 L. Ed. 2d 397, 97 S. Ct. 451 (1976).

"The highest level of scrutiny requires that the defendant demonstrate 'that the classification is necessary to serve a compelling state interest.' *Farley v. Engelken,* 241 Kan. at 670. This 'strict scrutiny' test has been applied by the United States Supreme Court in cases involving classifications such as race and fundamental rights guaranteed by the federal Constitution."

Thompson relies on *Farley* in urging that heightened scrutiny would be appropriate. His reliance on the principal opinion in *Farley* is misplaced, as explained in *Bair v. Peck,* 248 Kan. 824, 811 P.2d 1176 (1991); *Samsel v. Wheeler Transport Services, Inc.,* 246 Kan. 336, 355, 789 P.2d 541 (1990); and *Leiker v. Gafford,* 245 Kan. 325, 363, 778 P.2d 823 (1989). The following excerpt from *Samsel* was quoted in *Stephenson:*

" '[O]nly Justice Herd, the author of the opinion, and then Chief Justice Prager applied the heightened scrutiny analysis. Two justices, Justices Lockett and Allegrucci, concurred in the result but disagreed with the application of the heightened scrutiny test and applied the rational basis test. Both agreed that equal protection requires that all who are injured by another's negligent act have an equal right to compensation from the negligent tortfeasor, regardless of any classification that the legislature has attempted to impose. If the legislature wishes to change the rules of evidence by abrogating the collateral source rule, it may do so if applied equally to all who are injured by the negligent act of another. The three dissenting justices also applied the rational basis test.' 246 Kan. at 355." 250 Kan. at 776-77.

The rational basis test is the appropriate measure of equal protection in the present case. We have consistently recognized that the equal protection clause of the Fourteenth Amendment does not preclude the legislature from treating different claims

1018

of parties in different ways. A legislative classification will be upheld if the classification itself is rationally related to a legitimate legislative purpose. The classification, however, "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 64 L. Ed. 989, 40 S. Ct. 560 (1920).

In the present case, there is more than one classification in the statutory scheme which may merit scrutiny. The most obvious one, and the one singled out by the district court and the parties, is the application of the statute only in actions where the demand exceeds $150,000. Our first task, therefore, is to determine whether the classification of plaintiffs by the size of their demands is relevant to a legitimate State objective.

The legislative purpose, as stated by KFB, is to compensate "all tort victims fully for their injuries while reducing or eliminating recoveries by personal injury plaintiffs in excess of the total damages they have suffered." KFB makes several other statements of the legislative purpose: "The Kansas Legislature is attempting to reduce the overall cost of insurance by preventing 'double recoveries' in situations where the injured party is otherwise fully compensated." "All the Kansas legislature has attempted to do is reduce the instances of double recovery to lessen the burden on the insurance system."

"[I]ts legitimate purpose [is] to address concerns relating to the sky-rocketing cost and availability of insurance, and the tort system in general, by compensating all tort victims fully for their injuries while reducing or eliminating recoveries by personal injury plaintiffs in excess of total damages they have suffered."

KFB maintains that the "legislature's modification of the common law collateral source rule bears a 'real and substantial relation' to a legitimate legislative goal." This, of course, begs the question. It is not enough to say that the legislature achieved what it set out to do. The question is whether discriminatory aspects of the legislation bear a rational relationship to the legislature's objective. In this regard KFB offers scant guidance for the court. KFB seems to suggest that, because the statutory exemption "aids" plaintiffs seeking $150,000 or less, it is benign

and is merely one part of the overall statutory scheme for ensuring full compensation without windfalls.

Thompson contends that the classification is based on the severity of injuries suffered and that this basis is arbitrary, unreasonable, and discriminatory. He cites *Roe v. Diefendorf*, 236 Kan. 218, 689 P.2d 855 (1984), where a statute of limitations using the term "substantial injury" was at issue. The court stated:

"An unsubstantial injury as contrasted to a substantial injury is only a difference in degree, *i.e.*, the amount of damages. That is not a legal distinction. Both are injuries from which the victim is entitled to recover damages if the injury is the fault of another. A separate classification for the two, for purposes of limiting actions thereon, is in violation of the Equal Protection clause of the Fourteenth Amendment to the Constitution of the United States, because such classification has no legitimate legislative purpose." 236 Kan. at 222-23.

*Henry v. Bauder*, 213 Kan. 751, 518 P.2d 362 (1974), involved the constitutionality of the Kansas guest statute. There it was stated:

"The constitutional principle of equal protection does not preclude the state from drawing distinctions between different groups of individuals but does require that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." Syl. ¶ 2.

In the present case, KFB would have the court ask the question: Are plaintiffs who seek $150,000 or less similarly situated to those who seek more with respect to the objective of fully compensating injured persons without permitting duplicative recoveries? Another way of expressing the analysis is that the classification of plaintiffs into those seeking $150,000 or less and those seeking more than $150,000 must bear a rational relationship to the objective of fully compensating without overcompensating injured persons. In this alternative formulation, the court must be able to ascertain some rationality in the legislature's selecting plaintiffs seeking $150,000 or more, rather than some other group, to bear the burden of the legislation.

In *Stephenson*, the court discussed the question of fixing on the legislative objective as follows:

"Where the rational basis test is the measure of equal protection, 'statutory discrimination will not be set aside *if any state of facts reasonably may be conceived to justify it.*' (Emphasis added.) *McGowan v. Maryland*, 366 U.S. [420,] 426 [, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961)]. In this regard, Justice

Lockett stated in his concurring opinion in *Farley:* 'Where the legislature has enacted statutory provisions that do not unequivocally state the public policy, the courts may interpret the intention of the legislature.' 241 Kan. at 679. No authority has come to this court's attention which prohibits the court from inferring and supplying a purpose for legislation where it is not expressed, at least for the two least stringent levels of equal protection scrutiny." 250 Kan. at 779.

The legislative objective which KFB has inferred and supplied for analysis may be stated straightforwardly as the intention to cut costs of insurers and insurance. The question for the court is whether that goal and the classification of plaintiffs by the amount of the prayer bear some rational relationship.

KHA/KMS suggest that the purpose of the legislature was to alleviate a liability insurance crisis which was threatening the public good. They attribute the classification by amount of the demand to testimony of Professor James Concannon before the House Judiciary Committee on February 11, 1987. Concannon generally supported changing the collateral source rule, but he characterized the bill which eventually became K.S.A. 1992 Supp. 60-3801 *et seq.* as "an ill-conceived and grossly unfair way to make the change." He identified many problems with the bill, including the following:

"There will be new system costs from any legislation in this area. If the parties do not stipulate on these matters, there will have to be discovery, perhaps even from non-parties, relating to the amount and cost of collateral source benefits, the likelihood of continuation of collateral source payments by the provider, the provider's solvency, and the future eligibility of the plaintiff for benefits. Ironically, legislation justified in part by the fact it reduces system costs produces some of its own. Perhaps there is some monetary threshold at which we should recognize that the new system costs exceed the benefit."

KHA/KMS urges the court to adopt the view that the classification is rationally related to the cost-cutting objective as excluding prayers for which the cost of obtaining information on collateral source costs and benefits likely would be greater than the plaintiff's excessive recovery.

In an article on the legislation, it was noted that, among the conflicts in the provisions of the legislation, "the most obvious [is] that the legislature wants juries to hear evidence of present and future collateral source benefits but only when the entire

claim exceeds $150,000." Concannon and Smith, *Implementing the Kansas Collateral Source Rule,* 58 J.K.B.A. 19, 20 (Feb. 1989). In a footnote to this observation, the authors state: "There is no individual rationale for the $150,000 figure except that is the number to which four of the six conferees on the conference committee could agree." 58 J.K.B.A. at 20 n.13 (Feb. 1989).

KHA/KMS further contend that the court should not be concerned with where the legislature drew the line. This court has stated that "[e]stablishment of classifications with mathematic precision is not required." *State ex rel. Schneider v. Liggett,* 223 Kan. 610, 619, 576 P.2d 221 (1978). To the same effect, the court quoted a dissenting opinion of Mr. Justice Holmes: " ' . . . [W]hen it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark.' " 223 Kan. at 619 (quoting *Louisville Gas Co. v. Coleman,* 277 U.S. 32, 41, 72 L. Ed. 770, 48 S. Ct. 423 [1928]). A statutory classification that has a reasonable basis is not violative of the due process clause simply because it is not made with mathematical precision. Here, this court has nothing before it from which it could conclude whether the $150,000 line is reasonable or, if not, how far it lies from reasonableness. In *Henry,* the court stated that "[t]here must be some difference in character, condition, or situation, to justify distinction . . . ; otherwise, the classification is forced and unreal, and greater burdens are, in fact, imposed on some than on others of the same desert." (Citation omitted.) 213 Kan. at 753. Although the classification need not be mathematically precise, it must have a rational basis.

Regrettably, as previously noted there is very little, if any, legislative history to guide us in determining the purpose for the classification. Whether Professor Concannon's suggestion that a monetary threshold should be set actually explains the classification is immaterial under the rational basis test, which would uphold statutory discrimination " 'if any state of facts reasonably may be conceived to justify it.' " 250 Kan. at 779 (quoting *McGowan v. Maryland,* 366 U.S. 420, 426, 6 L. Ed. 2d 393, 81 S. Ct. 1101 [1961]). The parties to this action have not supplied any other "state of facts" for the court's contemplation. KFB, in

its initial and reply briefs, asserts a number of times with varying wording a reason for the legislation, but does not offer a reason for the classification or any suggestions as to how the classification relates to the goal of cutting costs of insurers and insurance.

Proponents of the statute contend that plaintiffs seeking $150,000 or less are not similarly situated to those seeking more with respect to the legislative objective of reducing insurance costs. Therefore, plaintiffs need not receive like treatment. The proponents' contention is that the line is drawn at an approximation of the dollar amount at which the potential duplicative recovery and the potential costs of discovery of collateral source converge. Below the line, potential costs of discovery are projected to be greater than potential savings from not duplicating recovery; above the line, potential costs of discovery are projected to be less than potential savings from not duplicating recovery. Plaintiffs making claims below the line do not further the objective of cutting costs of insurance due to the disproportionate costs of discovery. Plaintiffs making claims above the line do further this goal.

The problem with the proponents' contention is that they fail to provide facts or any data upon which to make such a projection, such as that plaintiffs seeking damages in excess of $150,000 have more collateral sources available to them than those plaintiffs seeking less, or that the costs of discovery are more because a plaintiff seeks damages in excess of $150,000, or that there is a statistical relationship between the amount a plaintiff claims and the collateral sources available to a plaintiff.

We are not presented with a set of facts upon which we can conclude the challenged classification is rationally related to a legitimate legislative purpose. Instead, we are presented with a wholly unsubstantiated assumption. Even assuming the objective of cutting insurance costs is a legitimate legislative goal, we do not find the classification in the present case will reasonably further that purpose. Under the rational basis test, great deference is given to the legislature in establishing classifications. However, where, as here, the only basis for the classification is to deny a benefit to one group for no purpose other than to discriminate against that group, the statutory classification is not only mathematically imprecise, it is without a rational basis and

is arbitrary. Here, the challenged classification unreasonably discriminates in favor of claimants demanding $150,000 or less and unduly burdens those seeking judgments in excess of $150,000. We hold that the provision of K.S.A. 1992 Supp. 60-3802 which allows evidence of collateral source benefits where claimant demands judgment for damages in excess of $150,000 violates the equal protection clause of the Fourteenth Amendment to the United States Constitution and § 1 of the Bill of Rights of the Kansas Constitution.

Due to our holding, the question of severability arises. The severability clause is found in K.S.A. 1992 Supp. 60-3806, which provides:

"If any provision or clause of this act or application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable."

In *Felten Truck Line v. State Board of Tax Appeals*, 183 Kan. 287, 300, 327 P.2d 836 (1958), the court stated the test to be applied:

"Whether the court may sever an unconstitutional provision from a statute and leave the remainder in force and effect depends on the intent of the legislature. If from examination of a statute it can be said that the act would have been passed without the objectional portion and if the statute would operate effectively to carry out the intention of the legislature with such portion stricken, the remainder of the valid law will stand. Whether the legislature had provided for a severability clause is of no importance. This court will assume severability if the unconstitutional part can be severed without doing violence to legislative intent."

In *State, ex rel., v. Consumers Warehouse Market*, 185 Kan. 363, 343 P.2d 234 (1959), the exemption of feed and grain dealers from the Unfair Practices Act was held to be unconstitutional. In holding the invalid provision was not severable from the entire Act, we said:

"The rule is stated very clearly in the early case of *Central Branch U.P.R. Co. v. Atchison, T. & S.F.R. Co.*, 28 Kan. *453, in which it was held:

'While it is undoubtedly true that a statute may be constitutional in one part, and unconstitutional in another, yet this rule obtains only where the two parts are separate and independent; and where they are so related that the latter is a condition of, a compensation for, or an inducement to, the

former, or where it is obvious that the legislature, having respect to opposing rights and interests, would not have enacted one but for the other, then the unconstitutionality of the latter avoids the entire statute.' (Syl. 1.)

"Tested by the foregoing statements of the rule, the answer to the question is obvious. The invalid portion of the statute is not a separate and independent provision of the Act, but rather is such an integral and inseparable part of the whole scheme and purpose of the law that it may not be severed therefrom and thus leave the remainder in full force and effect. In other words, to eliminate the objectionable exemption would change the scope of the Act and make it applicable to grain and feed dealers, whereas the legislature expressly declared they are not to be included. The question of severability here is readily distinguishable from that in the Consumers case, heretofore referred to. There it was held that a portion of 50-401 (e), which was merely one of a series of tests as to what is less than cost, was invalid, but, being severable, its invalidity did not affect the remainder of the Act.

"Not so here, and we refer again to the *Gustafson* case in which, on the question of severability, it was held:

'The exception of McPherson county is not a separate and independent provision which may be disregarded and leave the remainder of the act effective, since to eliminate the exception would change the scope of the law and make it applicable in territory where the legislature expressly declared it should not operate.' (syl. 3.)
and said;

'The declared purpose of the legislature is that the undersheriffs of McPherson county shall not receive the benefit of the law. This purpose informs the entire act, and the portion concerning McPherson county can not be eliminated without changing the whole scheme of the statute, even to the extent of making it applicable in territory where the legislature expressly said it should not operate.' (p. 336.)" 185 Kan. at 372-73.

Here, the classification of plaintiffs is not a separate and independent provision because to eliminate the classification would change the scheme of the Act by making it applicable to all plaintiffs. This is contrary to the stated purpose that it only applies to plaintiffs claiming damages in excess of $150,000. The invalidity of the provision of K.S.A. 1992 Supp. 60-3802 classifying claimants by the amounts of their demand does affect the remainder of the Act because, absent the invalid provision, the intent of the legislature would not be carried out. Striking the invalid provision changes the scope of the Act and therefore does violence to the legislative intent.

For the foregoing reasons, we find such provision is not severable and the entire Act is unconstitutional and void.

We next consider if the district court erred in allowing Thompson to question KFB's medical expert about his income. At trial the videotaped deposition of Dr. John Wertzberger was played for the jury. He testified that 35 percent of his practice was evaluating patients with disabilities. Thompson's attorney then asked the witness for an approximation of his income from the previous year. KFB objected on the ground of relevance. The witness answered the question despite KFB's objection. He stated, "I think I told you before that I don't know that. I make—my income is in excess of 200,000."

On appeal, KFB objects to the district court "allowing the evidence regarding Dr. Wertzberger's gross income before the jury." KFB fails to indicate how the complained-of portion of the videotape was to be excluded or even that a request was made to that effect. In the absence of such an assertion, there would not seem to be any basis on which we may find that the district court erred in permitting the jury to hear Dr. Wertzberger's testimony about his income. Moreover Dr. Wertzberger, KFB's witness, answered the question over KFB's objection.

However, KFB's argument seems to focus more on the impropriety of Thompson's counsel's remarks in closing argument than on the admission of the evidence. KFB argues that Thompson "was not entitled to inquire of Dr. Wertzberger his gross income, and then argue to the jury in closing arguments that Dr. Wertzberger 'makes $200,000.00 a year doing examinations like this.' " KFB further argues that the error is compounded by the misstatement, which KFB suggests was detrimental to the credibility of its expert witness. KFB, however, has not framed the issue as one of improper closing argument, and no objection was made to the closing argument remarks about Dr. Wertzberger's income. We find no merit in KFB's argument.

KFB next contends that the testimony of Thompson's medical witnesses should have been excluded due to Thompson's failure to comply with the requirements of K.S.A. 1992 Supp. 60-226(e). KFB argues that the duty imposed by 60-226(e)(1)(B) to supplement discovery responses to reveal the identity of persons expected to be called as expert witnesses at trial was breached by Thompson. KFB contends that the district court should have

penalized Thompson for the breach by excluding the testimony of Drs. Knappenberger, Hoehn, and Carter.

Thompson does not deny his failure to supplement discovery responses. Instead, he contends that the doctors are treating physicians rather than retained experts. He contends that, by custom, treating physicians are not treated as experts for purposes of 60-226(e)(1)(B) because their identities are known to other parties and medical records have been exchanged. This argument merges into one of lack of prejudice. Thompson further contends that KFB waived any objection to admission of the testimony because it never filed a motion to compel supplementation of discovery responses. Thompson, however, provides no authority which creates such a duty for KFB.

K.S.A. 1992 Supp. 60-226(e)(1)(B) provides:

"A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the party's response to include information thereafter acquired, except as follows:

(1) A party is under a duty seasonably to supplement the party's response with respect to any question directly addressed to . . . the identity of each person expected to be called as an expert witness at trial, the subject matter on which the party is expected to testify and the substance of the party's testimony."

Thompson has provided no direct authority for his position that treating physicians are not necessarily synonymous with expert witnesses, as that term is used in 60-226. KFB relies on *In re Estate of Millar*, 185 Kan. 510, 517, 345 P.2d 1033 (1959), for the proposition that treating physicians are "in the category of expert witnesses." The question in *Millar*, however, was far afield from the present inquiry—it centered on the competence of expert and nonexpert testimony to establish mental capacity of the testatrix. At issue was whether the opinion of a general physician as opposed to a psychiatrist or neurologist would suffice. Moreover, *Millar* was decided before this state's adoption of its current rules of evidence and discovery.

Common sense and the plain language of the statute, however, support Thompson's position. A "person expected to be called *as an expert witness*" typically would be a consultant whose connection with the case began during trial preparation rather than with the events upon which a plaintiff's claim is based and would

offer opinions based on information made known to him or her. A treating doctor, while certainly possessing special knowledge, skill, experience, and training required of a witness testifying as an expert, typically would be called principally to recount plaintiff's injury and treatment.

K.S.A. 60-456(a) permits opinion testimony by witnesses who are not testifying as experts, and 60-456(b) permits opinion testimony by witnesses who are testifying as experts. Subsection (a) allows a treating physician to inject incidental opinions into his account without transforming him from a witness who is not testifying as an expert into a witness who is testifying as an expert.

In *West v. Martin*, 11 Kan. App. 2d 55, 58, 713 P.2d 957, *rev. denied* 239 Kan. 695 (1986), the court held that the district court abused its discretion in ruling that plaintiff's treating physician could not give an expert opinion. Plaintiff had responded to a discovery request for the identification of each person expected to be called as an expert witness by referring to her witness list. Her treating physician was one of 12 medical practitioners among 23 listed witnesses. In the court's words, "Defendant was obviously not deceived." 11 Kan. App. 2d at 58. Nor did the trial judge find that defendant had been misled.

Nonetheless, the district court refused to allow the treating physician

"to testify as an expert witness because he was not identified . . . as an expert. The trial court would have allowed [the treating physician] to testify as a 'fact' witness. When faced with the limitation of testimony to his care and treatment of plaintiff, the plaintiff opted to not call [the treating physician] at all." 11 Kan. App. 2d at 57.

The Court of Appeals concluded that the trial court abused its discretion in limiting the treating physician's testimony. The Court of Appeals stated:

"We are unable to say [the treating physician's] testimony was cumulative. With the result reached by the jury in this case, we cannot say the exclusion of [his] testimony was not prejudicial. The trial court had effective options available other than excluding the expert testimony. Those options ranged from imposing sanctions on plaintiff's attorney to allowing defendant to interview or depose [the treating physician] prior to his being called." 11 Kan. App. 2d at 58.

KFB attempts to distinguish *West* on the ground that the discovery failure was much more egregious in the present case than in *West*. However, KFB concedes that Thompson provided it with the medical records of the treating physicians, and KFB does not seem to seriously assert that it was misled.

The admission or exclusion of expert opinion testimony is within the discretion of the trial judge. *Hudson v. City of Shawnee,* 246 Kan. 395, Syl. ¶ 10, 790 P.2d 933 (1990); accord *West v. Martin,* 11 Kan. App. 2d 55, Syl. ¶ 1. We do not find that the district court's discretion was abused in admitting the testimony of Thompson's treating physician in the present case. KFB was not misled or surprised. KFB deposed Drs. Hoehn and Carter during discovery, and their testimony was presented to the jury in the form of the videotaped depositions.

KFB next contends that the district court should have declared a mistrial based on remarks of Thompson's counsel regarding nonpayment by an insurance company. KFB complains of these remarks made by Thompson's counsel in closing argument:

"I don't think it takes much to conclude that when a car crosses the median on an interstate highway and hits you head on they are at fault. I don't intend to spend a lot of time arguing that. I think it's pretty clear to everyone and should be pretty clear to everyone. I think it is interesting, though, that an insurance company in order to use your money a year and a half and not pay the claim would seize on something like that as a basis not to pay the claim. . . .

 . . . .

". . . He was off work for ten weeks and only got back to work because he modified his truck so he can drive it with hand controls. You know that is the 'salt of the earth' kind of thing. That is effort you don't expect people to make in an effort to try to go back to work. And he had to. Certainly his insurance wasn't taking care of him. They forced him to do that, and he did that."

KFB asserts that "[b]oth of these remarks are contrary to the facts of this case." The truth, as stated by KFB, is that "K.F.B. Insurance Company substituted $50,000.00 thousand dollars in payment to plaintiff, pursuant to K.S.A. 60-284(f). . . . Plaintiff also received full wage benefits, medical and PIP benefits from another insurance company, Farm Bureau." KFB contends that the district court abused its discretion in failing to grant its motion for a mistrial.

Thompson denies that the facts were misstated, and he denies that KFB suffered prejudice as a result of the remarks. Thompson asserts that KFB failed to object to the remarks until his counsel's closing arguments were completed. He cites *Sieben v. Sieben,* 231 Kan. 372, 646 P.2d 1036 (1982), and *State v. Rouse,* 229 Kan. 600, 629 P.2d 167 (1981), for the principle that reversible error cannot be predicated on a complaint of counsel in closing argument where no objection was made.

Is it accurate to say that Thompson had to return to work because his own insurance company withheld payments from him and did so on a flimsy basis? The district court concluded that it was. In its memorandum decision entering judgment for Thompson, the district court wrote:

"The evidence supported the argument that the collision was the under-insured's fault and the jury found him 95% at fault. Further, in the plaintiff's response to the defendant's motion the Court is informed that the PIP benefits were paid to the plaintiff but that they were not paid by the defendant which the defendant has not disputed. There is therefore no basis for a finding the comments by plaintiff's counsel were untrue."

It does not appear from the district court's opinion that the argument with regard to substitution payment was made to the district court on this issue. K.S.A. 60-284(f) is the statute cited by KFB. KFB must be referring to K.S.A. 1992 Supp. 40-284(f). In response to KFB's argument, Thompson stated:

"[T]his payment was not made under any coverage of the insurance policy between plaintiff and the defendant, but was made pursuant to a statutory scheme which allows the underinsured carrier to substitute payment and obtain a subrogation interest against the tortfeasor. Thus, this was money due the plaintiff from the tortfeasor and not from the defendant. Moreover, the fact remains that the plaintiff was forced to sue the defendant to obtain the underinsured benefits of the policy between plaintiff and defendant."

KFB's cooperation seems to have been reluctantly bestowed, and KFB actually paid Verbal Russell's insurer rather than Thompson.

Thompson asserts that KFB failed to object until after closing argument was completed, but in fact KFB's counsel waited only until Thompson's counsel was told by the court that he had used all but his reserved two minutes. The objection followed closely on the heels of the remark that Thompson's insurer was not taking care of him. Neither of the cases relied upon by Thompson aids

him in this cause. In *Rouse*, this court was unable to determine whether the State made improper remarks in closing argument because the closing arguments were not transcribed. 229 Kan. at 607. In *Sieben*, the failure to object occurred in connection with admission of evidence, jury instructions, and the pretrial order. 231 Kan. at 375, 376, 377.

*Walker v. Holiday Lanes*, 196 Kan. 513, 413 P.2d 63 (1966), is a case relied on by both parties. Gertrude Walker injured her back when, due to a beverage spilled on the floor, her foot failed to slide as she delivered her bowling ball. In closing argument, counsel for the bowling alley referred to the depressed economy in Crawford County and stated that a verdict in Walker's favor would cause the economic relief which was on the horizon to evaporate. He stated that the publicity of a verdict for Walker would reach potential industry and cause it to settle elsewhere. 196 Kan. at 518. The trial court concluded that "matters concerning public opinion had been improperly injected in the case by the defendant." 196 Kan. at 519.

This court stated the following principles:

"When error is alleged because of improper argument of counsel in which reference is made to clearly extraneous matters, and objection has been timely interposed, it is incumbent upon the court to ascertain the purpose and probable effect of such comments on the jury. If under the facts and circumstances the only purpose and probable effect of the comments were to produce a prejudicial attitude toward a litigant, a new trial may result. . . .

. . . .

". . . We are not unmindful of our many decisions that whether or not such misconduct constitutes reversible error is a matter for determination by the trial court, and that its ruling thereon will not be disturbed in the absence of a clear abuse of discretion." 196 Kan. at 519-20.

In the present case, we do not find an abuse of discretion in the district court's determination that the remarks did not constitute reversible error. The charges of counsel misconduct in this case certainly are not of the same magnitude as those complained of in *Walker*. Thompson's counsel did not attempt to persuade the jurors that they would be responsible for the economic decline of their county if they should return a verdict against his client. The charges also are not on the same scale as those complained of in *Glynos v. Jagoda*, 249 Kan. 473, 819 P.2d 1202 (1991),

another case cited by KFB. *Glynos* involved injuries which resulted from plaintiff's walking into a sliding glass door after emerging from the swimming pool. Defendants' theory of nonliability included the apartment complex's satisfying the building codes. In closing argument, Glynos' counsel referred to the highly publicized tragedy at a tea dance at the Hyatt Regency Hotel in Kansas City: " 'And while this is not on the same magnitude, I will tell you that the Hyatt Regency met the building code.' " 249 Kan. at 480. The judgment was reversed on other grounds, but this court chose to address the issue of the closing argument. The court stated:

"Counsel's argument referring to the Hyatt Regency was improper. The remark referred to extraneous matters not in evidence.

"The Hyatt Regency collapse was highly publicized and affected a great number of Kansas City area residents residing in the county where this case was tried. The trial court's overruling of Meadowlark Hill's objection endorsed the impropriety." 249 Kan. at 481.

The decision of the district court should not be disturbed in the absence of a clear abuse of discretion, and such an abuse is not present in the court's ruling on Thompson's counsel's remarks in closing argument. Unlike the circumstances in *Walker*, the misconduct here has not "so permeated and tainted" the proceedings that the complaining party has been deprived of a fair trial. See 196 Kan. at 520.

The jury awarded $40,000 for future economic loss. KFB contends that the award is not supported by the evidence and is a result of the passion and prejudice encouraged in the jurors by Thompson's counsel. As additional evidence that the jury acted out of passion and prejudice, the jury award of $85,000 for future medical expenses is cited by KFB. The district court reduced the award for future medical expenses to $3,000.

KFB relies on *Wisker v. Hart*, 244 Kan. 36, 37, 766 P.2d 168 (1988), for the proposition that the award must be overturned because, even with all reasonable inferences drawn in favor of Thompson, the evidence does not support the verdict. Thompson relies on *Leiker v. Gafford*, 245 Kan. 325, Syl. ¶ 10, 778 P.2d 823 (1989), for the proper test:

"Where a charge of excessive verdict is based on passion or prejudice of the jury but is supported solely by the size of the verdict, the trial court

will not be reversed for not ordering a new trial, and no remittitur will be awarded unless the amount of the verdict in light of the evidence shocks the conscience of the appellate court. Where the alleged passion or prejudice of the jury is not shown by definite proof, but depends for support solely on the size of the verdict, the award will be upheld unless it shocks the conscience of the court. There is no simple, symmetrical pattern or design for determining whether a verdict is sufficient or insufficient, since each case must stand on its own facts."

KFB's reliance on *Wisker* is misplaced. That case was a medical malpractice action in which the jury found the plaintiff's decedent more than 50 percent at fault. No damages were calculated by the jury because plaintiff was not entitled to recover any. Thus, it was the jury's verdict favoring the medical defendants rather than the amount of damages awarded which was challenged by plaintiff/appellant as being contrary to the evidence.

In *Leiker*, the medical defendants challenged the jury verdict for damages on the ground that the amount awarded was excessive. 245 Kan. at 346-49. Defendants argued that the award was the result of passion and prejudice. 245 Kan. at 346. The argument was based solely on the size of the verdict. In these circumstances the test applied by this court was whether the amount of the jury verdict does or does not shock the court's conscience. 245 Kan. at 347.

This test appears also to be applicable in the present case. Because the determination for each case depends on its own facts, 245 Kan. 325, Syl. ¶ 10, a comparison of Thompson's evidence of future economic loss with the jury's award for that item of damages is in order.

At the time of trial, Thompson still had a rod and some screws in his left leg which were to be surgically removed. Dr. Knappenberger estimated that Thompson would be on crutches for two to three weeks after removal of the hardware. Dr. Knappenberger also testified that pain experienced by Thompson in his left knee will not be improved or eliminated by removal of the hardware or by time and that traumatic arthritis may be expected to increase Thompson's stiffness and pain.

KFB ignores the evidence of pain and stiffness which place limitations on Thompson's activities, and KFB contends that surgery and convalescence will not affect Thompson's income. The question here is what financial effect his physical condition will

have on Thompson. KFB points to Thompson's testimony that he will have the removal surgery during the slow winter months and that with the installation of the hand-operated clutch he was able to drive his dump truck while still on crutches after the initial surgery. KFB wants the court to conclude from this evidence that Thompson will suffer no adverse financial effect.

Thompson argues that, even if his gross income is not substantially reduced, his net income will be significantly affected by outlay for maintenance of his truck. Thompson testified that he previously spent winter months overhauling his truck, but now is unable to do much of the mechanical work. He claims the repairing and rebuilding work on his truck, which necessarily will be hired out, will "amount to a substantial sum of money." Thompson's tax records showed the following figures:

| 1987 | $40,399 | gross income | $15,172 | expenses |
|------|---------|--------------|---------|----------|
| 1988 | $49,551 | " | $22,476 | " |
| 1989 | $49,912 | " | $20,098 | " |
| 1990 | $38,095 | " | $25,456 | " |

For the year in which he was injured, Thompson's gross income fell and his expenses escalated. Nothing more specific than this general observation is apparent in the record on appeal. However, we cannot say the verdict is contrary to the evidence or a result of passion and prejudice.

Finally, KFB argues that the district court should have granted judgment in favor of KFB due to Thompson's failure to comply with K.S.A. 1992 Supp. 40-284(f). KFB's statement of this issue is as follows: "The district court erred as a matter of law in failing to grant judgment in favor of defendant based upon the failure of plaintiff to comply with the provisions of K.S.A. 40-284(f)." The argument developed by KFB is that Thompson breached a provision in his insurance policy. KFB's conclusion, however, is that Thompson's settlement with the tortfeasor's estate and insurer "has impaired [KFB's] rights to subrogation, in violation of K.S.A. 40-284(f) and 40-287."

Thompson contends that KFB did not rely on its policy when it presented this argument to the district court. He contends that the policy was not introduced in the district court and is not a part of the record on appeal. He urges this court to disregard those portions of the argument which are based on the insurance

policy and are raised for the first time on appeal. See *Diversified Financial Planners, Inc. v. Maderak,* 248 Kan. 946, Syl. ¶ 3, 811 P.2d 1237 (1991). KFB's reply brief does not touch on this issue.

With references to the policy left out, here is an outline of KFB's argument: Thompson settled his claim against Verbal Russell and released him, his estate, and his insurer. Any defense available to Verbal Russell is available to KFB. See *Chance v. Farm Bureau Mut. Ins. Co., Inc.,* 756 F. Supp. 1440, 1443 (D. Kan. 1991). Thompson, therefore, is barred from recovering from KFB and has impaired KFB's rights of subrogation. See *Horace Mann Ins. Co. v. Ammerman,* 630 F. Supp. 114, 117 (D. Kan. 1986); *Benson v. Farmers Ins. Co.,* 227 Kan. 833, 839, 610 P.2d 605 (1980).

KFB's argument, that its right of subrogation was impaired, depends upon its motion to intervene in Thompson's action against Russell, Case No. 90-C-10967, filed in Johnson County District Court, and the determination made in that case. As Thompson points out:

"The briefs of both parties and the decision of the trial court concerning [KFB's] motion to intervene in [Case No. 90-C-10967] are not a part of the record of this case before this court. Any issues concerning whether the defendant was given proper notice pursuant to K.S.A. 40-284(f), or whether it properly substituted payment are to be determined in that case, which [Thompson] understands to be on appeal to the Kansas Court of Appeals. Clearly, this issue is not properly before the court in this case nor is there a sufficient record for the court to make a decision and, therefore, the court should refuse to consider this issue."

We agree and find that the record before this court is not sufficient to consider the final issue asserted by KFB.

The judgment of the district court is affirmed.

SIX and ABBOTT, JJ., not participating.

JEAN F. SHEPHERD and WILLIAM J. DICK, district judges, assigned█